No. 23-15846

In the

# United States Court of Appeals
## for the Ninth Circuit

_____

DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSONY GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, AND IVAN CALVO-PÉREZ

*Plaintiff – Appellant*

v.

MICROSOFT CORPORATION, a Washington corporation

*Defendant – Appellee*

-------------------------------------

**On Appeal from the United States District Court
for the Northern District of California**
Case no. 3:22-cv-08991-JSC
Honorable Jacqueline Scott Corley

_____

## APPELLEE'S RESPONSE TO
## MOTION FOR TEMPORARY INJUNCTION PENDING APPEAL

_____

Valarie C. Williams
Tania Rice
ALSTON & BIRD LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com

Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
adam.banks@weil.com

*Counsel for Defendant – Appellee*

B. Parker Miller
Robert H. Poole
ALSTON & BIRD LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com
robert.poole@alston.com

David R. Venderbush
ALSTON & BIRD LLP
90 Park Avenue
15th Floor
New York, NY 10016
Telephone: (212) 210-9400
david.venderbush@alston.com

Rakesh N. Kilaru
Anastasia M. Pastan
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
rkilaru@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com

*Additional Counsel for Defendant-Appellee*

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...............................................2

I.   The Merger Agreement .....................................................................2

II.  Plaintiffs' Lawsuit ............................................................................3

III.   Plaintiffs' Original Preliminary Injunction Motion ......................................3

IV.   The District Court's Denial ..............................................................4

V.  Plaintiffs' Appeal and Motion for Preliminary Injunction in This Court ........5

VI.   The Federal Trade Commission's Motion for Preliminary Injunction in the District Court ......................................................5

ARGUMENT ......................................................................................6

I.   Plaintiffs' Motion Should Be Denied Because They Failed to Move in the District Court. ......................................................................6

II.  Plaintiffs Fail to Argue, Much Less Show, That They Are Likely to Succeed on the Merits of Their Antitrust Claims ...........................................8

III.   Plaintiffs Still Cannot Show Immediate, Irreparable Harm .......................11

CONCLUSION ...................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agudath Isr. of Am. v. Cuomo*,
980 F.3d 222 (2d Cir. 2020) ............................................................6, 7

*All. For The Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...........................................................8

*American Passage Media Corp. v. Cass Communications, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ..........................................................16

*Bayless v. Martine*,
430 F.2d 873 (5th Cir. 1970) .............................................................7

*Boardman v. Pacific Seafood Group*,
822 F.3d 1011 (9th Cir. 2016) ....................................................15, 16

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
996 F.3d 37 (1st Cir. 2021)................................................................7

*California ex rel. Van de Kamp v. Am. Stores Co.*,
697 F. Supp. 1125 (C.D. Cal. 1988), *aff'd in part*, 872 F.2d 837 (9th Cir.
1989), *stay granted*, 492 U.S. 1301 (1989), *rev'd*, 495 U.S. 271 (1990)...........15

*California v. American Stores Co.*,
495 U.S. 271 (1990)................................................................15, 16

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)..........................................................................12

*Dehoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) .............................................................9

*Feldman v. Ariz. Sec'y of State's Office*,
843 F.3d 366 (9th Cir. 2016) (en banc) ..............................................8

*Gerber v. Herskovitz*,
No. 22-1075, 2022 U.S. App. LEXIS 14890 (6th Cir. May 31, 2022) ...............7

*Hooks v. Nexstar Broad., Inc.*,
  54 F.4th 1110-15 (9th Cir. 2022)...........................................................14

*Immigrant Legal Res. Ctr. v. City of McFarland*,
  827 F. App'x 749 (9th Cir. 2020) ...............................................12, 14

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) (en banc) ..............................................8

*Malaney v. UAL Corp.*,
  No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sep.
  27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011)...........................14

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023) ..........................................................10

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................11

*S. Bay United Pentecostal Church v. Newsom*,
  959 F.3d 938 (9th Cir. 2020) .............................................................11

*Scholl v. Mnuchin*,
  2020 U.S. App. LEXIS 32275 (9th Cir. Oct. 13, 2020) .......................7

*Taleff v. Sw. Airlines Co.*,
  828 F. Supp. 2d 1118 (N.D. Cal. 2011), *aff'd on other grounds*, 554 F.
  App'x 598 (9th Cir. 2014) .................................................................17

*United States v. Borden Co.*,
  347 U.S. 514 (1954)......................................................................11, 14

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ...............................................................9

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................8, 11, 14

iv

**RULES**

Fed. R. App. P. 8 ...................................................................................11

Fed. R. App. P. 8(a) ...............................................................................6

Fed. R. App. P. 8(a)(2)(E) .....................................................................11

Fed. R. App. P. 27(d) ............................................................................18

**STATUTES**

15 U.S.C. § 26 .......................................................................................11

Clayton Act .............................................................................3, 11, 12, 17

## **INTRODUCTION**

Plaintiffs are ten video game enthusiasts seeking to enjoin the $68.7 billion merger of Microsoft Corporation ("Microsoft") and Activision Blizzard ("Activision"). They seek this drastic remedy based on speculative fears that they might pay higher prices for new versions of their favorite games, or be compelled to purchase new gaming consoles to play them at some unknown point in the future. The district court properly denied Plaintiffs' request to block the merger because Plaintiffs failed to show they would suffer immediate irreparable harm if the transaction closes.

Plaintiffs' motion for a temporary injunction pending appeal similarly fails to meet the exacting standard for the extraordinary injunctive relief they seek. The motion is deficient and should be denied for three independent reasons. *First*, the motion is not properly before this Court, because Plaintiffs failed to first move in the district court, as the Federal Rules of Appellate Procedure require, and have not shown that it would have been impracticable to do so. *Second*, Plaintiffs fail to make, and thus forfeit, any argument that they are likely to succeed on the merits of their antitrust claims—a necessary predicate to the award of an injunction blocking the merger. *Third*, Plaintiffs fail to persuade on the only relevant issue they do address, and as the district court correctly concluded, Plaintiffs have not shown that they will be immediately and irreparably harmed by the proposed merger.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Merger Agreement

In January 2022, Microsoft and Activision entered into and publicly announced a merger agreement for Microsoft to acquire Activision for $68.7 billion. 1-ER-002.[1] Microsoft makes the Xbox, a prominent video game platform. *Id*. Activision develops and publishes various video games, including the popular game *Call of Duty*. *Id*. *Call of Duty* is a multi-player, cross-platform game, which gamers can play by themselves or with their friends across the platforms on which it is currently offered: Microsoft Xbox, Sony PlayStation, and personal computers. *Id*.

Activision and Sony are operating under a contract (which Microsoft will assume upon closing its acquisition of Activision) that makes *Call of Duty* available on PlayStation until at least the end of 2024. Ex. C § 2.4; Ex. D at 112:2-113:21. Microsoft also has made Sony an offer to extend that access for ten more years. Ex. B at ¶¶ 335-36. Further, Microsoft has entered into multiple ten-year contracts to make *Call of Duty* and other Activision content available on competing platforms post-merger, including on cloud gaming services (on which *Call of Duty* has not previously been available). *See* Exs. E at 1 and F at 8. The next title in the *Call of*

---

[1] Plaintiffs' Motion attaches as exhibits documents formatted as an excerpted record. Microsoft will cite Plaintiffs' documents using the excerpted record format "#-ER-###." Microsoft will cite to the exhibits filed in support of this response as "Ex. #."

*Duty* franchise is not expected until November 2023. Ex. O. New generations of consoles are released every five to ten years. Ex. B at ¶ 50.

## II.     Plaintiffs' Lawsuit

In December 2022—almost a year after the merger was announced—Plaintiffs filed their lawsuit seeking to block the merger under the Clayton Act. 1-ER-003. In March 2023, the district court dismissed Plaintiffs' initial complaint for failure to state a claim. 1-ER-003. Twenty days later, Plaintiffs filed an Amended Complaint. 1-ER-004. The Amended Complaint alleges that, after the merger, Microsoft will make *Call of Duty* and other Activision Blizzard content exclusive to Microsoft platforms and subscription services leading to higher prices for future Activision content and other harms for gamers. *See generally* Ex. B at ¶¶ 123-28. Microsoft's motion to dismiss the Amended Complaint remains pending in the district court.

## III.     Plaintiffs' Original Preliminary Injunction Motion

In April 2023, Plaintiffs moved for a preliminary injunction to block the closing of the merger until after a trial on the merits of their request for a permanent injunction. 1-ER-001. In connection with their motion for a preliminary injunction, six of the Plaintiffs submitted declarations stating that they play existing versions of *Call of Duty* and several other games on a variety of platforms, including the PlayStation, Xbox, and Windows PC. 1-ER-002-03. The district court exercised its

discretion to consider first whether (1) Plaintiffs would suffer immediate, irreparable harm upon the closing of the merger, and (2) Plaintiffs would be required to post a bond if the preliminary injunction were granted. *Id*. Plaintiffs never objected to the district court's sequencing of the issues. Plaintiffs did not ask the district court to also rule on the other preliminary injunction factors: likelihood of success on the merits, balance of the equities, and public interest.

## IV.    The District Court's Denial

On May 19, 2023, the district court denied Plaintiffs' motion for a preliminary injunction because Plaintiffs failed to show a likelihood of immediate, personal irreparable harm. ER 002-03. The district court found "nothing in the record that suggests upon the merger Microsoft can do anything to make these *Call of Duty* versions currently owned by Plaintiffs somehow stop working, let alone that it would do so," so nothing would immediately change with the merger. 1-ER-005. It further found that "it is not likely Microsoft will make any new version of *Call of Duty* that becomes available before a decision on the merits exclusive to Microsoft." *Id*. And the court found that "Plaintiffs' **speculation** that Microsoft could violate its written agreements [to make the games available to competitors] is insufficient to meet their burden of showing a likelihood of immediate irreparable harm." 1-ER-005-006 (emphasis added). The court also found that "following the merger, Activision will continue to exist as a subsidiary of Microsoft," and therefore, potential harm, if any,

4

from a merger could be undone after the merger. 1-ER-008. Because Plaintiffs had not shown that they would suffer immediate, irreparable harm, the district court had no occasion to address the other factors required to issue a preliminary injunction. 1-ER-009.

**V.    Plaintiffs' Appeal and Motion for Preliminary Injunction in This Court**

On June 2, 2023—14 days after the district court's order denying Plaintiffs' motion for a preliminary injunction, Plaintiffs filed a notice of appeal. *See* 3:22-cv-08991-JSC, ECF No. 207. Plaintiffs then waited seven more days—for a total of 21 days after the district court's order—to file this motion seeking an injunction pending the appeal. Mot. at 11. Plaintiffs did not file a motion for a preliminary injunction pending appeal with the district court. *Id*. at 3.

**VI.    The Federal Trade Commission's Motion for Preliminary Injunction in the District Court**

On June 12, 2023, the Federal Trade Commission ("FTC") filed a complaint in the District Court for the Northern District of California seeking a temporary restraining order and preliminary injunction. *See* 23-cv-2880-JSC, ECF No. 1. On June 13, 2023, the FTC's parallel action was designated as related to the Plaintiffs' action below and assigned to the same district court judge. *See* 3:22-cv-08991-JSC, ECF No. 216. On the same day, the district court granted the FTC a temporary restraining order preventing Microsoft's merger with Activision until five days after the district court rules on the FTC's request for a preliminary injunction, or another

5

date set by the district court in the future, whichever is latest. 23-cv-2880-JSC, at ECF No. 37. The district court scheduled an evidentiary hearing on the FTC's preliminary injunction request for June 22nd, 23rd, 27th, 28th, and 29th. 23-cv-2880-JSC, at ECF No. 76.

## **ARGUMENT**

### I. **Plaintiffs' Motion Should Be Denied Because They Failed to Move in the District Court.**

At the threshold, the Court should deny Plaintiffs' motion for a preliminary injunction pending appeal because Plaintiffs failed to bring that motion first in the district court, and they offer no valid excuse for that failure.

Federal Rule of Appellate Procedure 8(a) requires that "[a] party must ordinarily move first in the district court for . . . an injunction while an appeal is pending" unless they can "show that moving first in the district court would be impracticable." Where this requirement is not met, a motion is not "properly before" the court of appeals and should be denied. *Agudath Isr. of Am. v. Cuomo*, 980 F.3d 222, 225 (2d Cir. 2020).

Here, Plaintiffs concede that they did not first move in the district court. *See* Mot. at 3. Rather than pointing to any impracticability of doing so, Plaintiffs argue only that they "did not move for an injunction pending appeal in the district court first[] because the district court already denied Plaintiffs' Motion for Preliminary Injunction." *Id.* This cannot meet the standard for showing impracticability, as

6

confirmed by numerous courts. Indeed, "under [this] definition no party seeking a stay of a district court ruling pending appeal would need to move in the district court first." *Gerber v. Herskovitz*, No. 22-1075, 2022 U.S. App. LEXIS 14890, at *3 (6th Cir. May 31, 2022); *see also, e.g.*, *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 43 (1st Cir. 2021) ("We disagree with plaintiff that the district court's rejection of plaintiff's claims on the merits suffices to show that moving first in the district court would have been impracticable."); *Bayless v. Martine,* 430 F.2d 873, 879 n.4 (5th Cir. 1970) ("It does not follow from the refusal to grant a preliminary injunction pending a trial in the court below that the district court would refuse injunctive relief pending an appeal.").

Nor could Plaintiffs have shown impracticability even had they tried to do so: Plaintiffs could have sought an injunction pending appeal in the district court any time during the 21 days they waited between the district court's decision and filing their motion in this Court. *See Agudath Isr.*, 980 F.3d at 225 (finding a failure to demonstrate impracticability "particularly in light of the fact that a full eleven days elapsed after the district court's ruling before Agudath Israel sought relief from this Court").

Plaintiffs' failure to first move in the district court necessitates denying their motion. *See, e.g.*, *Scholl v. Mnuchin,* 2020 U.S. App. LEXIS 32275, at *1-2 (9th Cir. Oct. 13, 2020) (denying stay pending appeal solely because "appellants have not

established that it would have been impracticable to present the stay motion and the evidence on which appellants rely to the district court in the first instance").

## II.    Plaintiffs Fail to Argue, Much Less Show, That They Are Likely to Succeed on the Merits of Their Antitrust Claims.

An injunction pending appeal, just like a preliminary injunction, is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc) (the same analysis applies to injunctions pending appeal as to preliminary injunctions). The party seeking the injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. Alternatively, the moving party may also demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). "Of course, plaintiffs must also satisfy the other *Winter* factors": whether the plaintiff would likely experience irreparable harm and whether an injunction is in the public interest. *Id.*

Plaintiffs, however, fail to present—and thus forfeit—any argument that they are likely to succeed on the merits of their antitrust claims or even that their claims

raise "serious questions." Plaintiffs' failure to address the issue is glaring. Antitrust claims hinge on specific economic facts about the particular markets at issue—facts that are entirely absent from Plaintiffs' short motion. *See United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) (antitrust cases "must make economic sense"); *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (to prevail on a Section 7 claim, a plaintiff must show a "reasonable probability" that the merger will substantially lessen competition in the relevant market). Plaintiffs also offer no real support for their assertion that the balance of equities tip in their favor or that the public interest favors an injunction, relying solely on generic, unsupported statements about harm to competition. *See* Mot. at 8-9, 11. Nor were any of these factors addressed below, because the district court did not need to reach them. 1-ER-009. Plaintiffs' failure to present this Court with any argument on these essential factors is a second, independent reason why their motion must be denied.

Plaintiffs try to sidestep this fatal shortcoming by mischaracterizing the district court's decision and the well-established standard for seeking injunctive relief. As Plaintiffs see it, because the district court addressed only the irreparable harm prong of the analysis, they need only show irreparable harm to justify an injunction of the merger. But this is not the standard: Plaintiffs must meet *every* prong of the analysis to secure injunctive relief. It would thus be improper to grant an injunction pending appeal based only on a finding about irreparable harm.

Microsoft did not have the opportunity to present its merits arguments in the below proceeding, because the district court asked it to brief the issue of irreparable harm first. Plaintiffs vaguely suggest that the district court concluded that they were likely to succeed on the merits, but that is not so. Mot. at 3. The district court "assume[d] *without deciding* Plaintiffs have established a likelihood of success on the merits" in order to first address the issue of irreparable harm. 1-ER-001 (emphasis added). "[A]ssumptions are not holdings." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023). As the district court explicitly stated, it was not addressing the merits of Plaintiffs' antitrust claims and would receive further briefing and argument on that issue only if Plaintiffs could show irreparable harm. It certainly did not resolve the merits in Plaintiffs' favor. An injunction cannot be imposed on any such assumption.

Plaintiffs should not be permitted to skip the line and ask this Court to issue an injunction, without any argument on the likelihood of success on the merits in this Court and without a complete record on that issue in the lower court. Even were Plaintiffs able to show on appeal that they will be irreparably harmed by the merger (they are not), the relief they would be entitled to is only the opportunity to have the district court consider the remaining prongs of the analysis in the first instance—not the injunction Plaintiffs seek from this Court. Plaintiffs' deficient presentation of

these critical issues only underscores the significance of their procedural failure to first seek an injunction pending appeal from the district court.

Because Plaintiffs failed to properly address a likelihood of success on the merits and other necessary elements, their motion must be denied.[2]

## III.   Plaintiffs Still Cannot Show Immediate, Irreparable Harm.

Plaintiffs' motion to this Court fails—as it did in the district court—because Plaintiffs fail to meet the required standard of personal and immediate irreparable harm. To obtain injunctive relief under Rule 8, a movant must show a likelihood of irreparable injury to the applicant that will occur while the appeal is pending. *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Showing a mere possibility of irreparable injury is insufficient. *Winter*, 555 U.S. at 7. Further, under both Section 16 of the Clayton Act and the regular factors for a preliminary injunction, Plaintiffs must show that the irreparable injury is immediate and personal to them. *See* 15 U.S.C. § 26 (allowing a preliminary injunction upon "a showing that the danger of irreparable loss or damage is immediate"); *United States v. Borden Co.*, 347 U.S. 514, 518

---

[2] Even if an injunction was justified, Plaintiffs would need to post a bond sufficient to cover Microsoft's anticipated costs and damages of compliance, which would include, at least, the $3 billion "Breakup Fee" that Microsoft will have to pay if an injunction causes the transaction to fail to close. *See* Ex. C § 8.3(c); Fed. R. App. P. 8(a)(2)(E) (permitting the Court to "condition relief on a party's filing a bond or other security in the district court"). Whether a bond is needed and in what amount is yet one more issue Plaintiffs' Motion fails to address.

(1954) ("Under [Section 16], a private plaintiff may obtain injunctive relief against [antitrust] violations only on a showing of 'threatened loss or damage'; and *this must be of a sort personal to the plaintiff*") (emphasis added); *City of Los Angeles v. Lyons*, 461 U.S. 95, 103, 111 (1983) (injunctive relief can only be issued to prevent a "substantial and immediate irreparable injury"); *Immigrant Legal Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751-52 (9th Cir. 2020) ("The standard for preliminary injunctions, however, requires irreparable harm to the plaintiffs themselves.").

For the same reasons the district court found that Plaintiffs would not suffer harm prior to a trial on the merits, Plaintiffs will not face any harm prior to the resolution of their appeal—likely within a similar time frame.[3] As the district court found, a merger will not harm Plaintiffs over the next several months because they will still be able to play the *Call of Duty* titles they currently own "exactly the same way they played with their friends before the merger." 1-ER-005. The next title in the *Call of Duty* series (the series which each Plaintiff focuses on as important to him) is not expected to be released until November and is subject to contractual commitments that it will be available on at least the same platforms as before.

---

[3] Under the current schedule, briefing on Plaintiffs' appeal will conclude by August 18, 2023.

Plaintiffs do not mount a challenge to the district court's finding that the merger will not affect the next versions of the game.

Instead, Plaintiffs offer red herrings and legal arguments that have been consistently rejected. *First*, their claim that the district court "ignored and failed to consider key evidence" is meritless. Mot. at 5. For example, although the district court did not name the Plaintiffs' expert in its Order, there is no indication that the court did not consider it when it found that the alleged anticompetitive price effects would not "begin to be felt" immediately after the merger. Mot. at 5. Similarly, Plaintiffs' reference to a single email presenting a thought experiment regarding business strategy—dated prior to the execution of numerous contracts to make *Call of Duty* available on competing platforms—does nothing to rebut the district court's finding that there is no immediate threat of Microsoft making *Call of Duty* exclusive to its platforms in light of those contractual commitments. 1-ER-005-06. Plaintiffs' evidence was before the district court. Their best evidence does nothing to undermine the court's correct factual findings.

*Second*, Plaintiffs' argument that the district court should have held that "harm to competition in a market . . . constitute[s] irreparable harm to consumers who actively participate in that market" is legally wrong. Mot. at 4. Under Plaintiffs' theory, if they are likely to succeed on the merits of their claim—showing that the merger will harm competition in a market—then the immediate irreparable harm

prong is also met for any "participant" in that market. But as the district court recognized, that argument improperly conflates two separate prongs of the preliminary injunction analysis by presuming that a likelihood of success on the merits necessarily equals irreparable harm to any "participant" in the relevant market. *See* 1-ER-006. As the district court noted, the Supreme Court has rejected this argument, holding that an injunction "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32; 1-ER-006 (citing *Winter*); *see also Hooks v. Nexstar Broad., Inc.*, 54 F.4th 1110-15 (9th Cir. 2022) (reversing a district court's finding that "when there is a likelihood of success on the merits there is an inference of irreparable harm to union representation from the continuation of the unfair labor practice."). Plaintiffs' legal argument would effectively eliminate the personal harm requirement from black letter injunctive relief law. *See Borden Co.*, 347 U.S. at 518 (private plaintiffs may seek injunctive relief against violations of federal antitrust law, but "only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff"); *Immigrant Legal Res. Ctr.*, 827 F. App'x at 75172 ("The standard for preliminary injunctions, however, requires irreparable harm to the plaintiffs themselves."). The district court's holding was correct and in line with other judges' rejection of Plaintiffs' very same arguments. *See Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049, at *46 (N.D. Cal. Sep. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011).

Plaintiffs continue to rely on the two inapposite cases that they cited below and which were readily distinguished by the district court. *See* Mot. at 4-5. As the district court explained, "Plaintiffs' reliance on *Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) and *California v. American Stores Co.*, 495 U.S. 271 (1990) . . . is misplaced." 1-ER-006. Both cases featured harms to competition that were direct and personal to the plaintiffs. In *American Stores*, the California Attorney General brought suit on behalf of all California residents to challenge the proposed merger between California's largest supermarket chain with the nation's fourth largest supermarket chain. *California ex rel. Van de Kamp v. Am. Stores Co.*, 697 F. Supp. 1125, 1134 (C.D. Cal. 1988), *aff'd in part*, 872 F.2d 837, 844 (9th Cir. 1989), *stay granted*, 492 U.S. 1301, 1304 (1989), *rev'd*, 495 U.S. 271 (1990). California consumers faced personal harm because the court found that the merger would permanently and irrevocably impact the state's grocery supply, which even if monetary in nature, would be "extremely difficult, if at all possible," to remedy. *See id*. As the district court below explained, "[t]he immediate irreparable harm to consumers from fewer grocery store choices upon chain store consolidation is unlike the distant harm proffered here." 1-ER-007.

In *Boardman*, fishermen who sold fish in the market at issue challenged a merger that they claimed would create a monopoly for the purchase of caught fish. 822 F.3d at 1016-17, 1023. To establish irreparable harm, the *Boardman* plaintiffs

15

provided detailed declarations supporting that the defendant was likely to unilaterally set fish prices below competitive market levels, causing the fishermen to struggle and be unable to maintain their fishing vessels. Ex. G at ¶¶ 5, 7. The *Boardman* plaintiffs established an irreparable injury personal to themselves—a monopsony that would immediately threaten their livelihood. 822 F.3d at 1022-23. As the district court here explained, "[t]he Ninth Circuit did not hold that a threat of irreparable harm, even if not immediate, is sufficient for issuance of a preliminary injunction." 1-ER-007.

Plaintiffs failed to show a personal harm similar to those harms analyzed in *American Stores* and *Boardman*. As the district court below correctly noted, even assuming evidence existed that Microsoft would make Activision games exclusive upon closing the merger (it does not), Plaintiffs will continue to access and play their *Call of Duty* titles on their preferred gaming platforms pending the trial below. 1-ER-005. The same is true for the pendency of this appeal.

Separately, Plaintiffs also fail to show that their purported future harms of paying more money for video games and consoles is irreparable, which is a question the district court did not reach. *See* Exs. H at ¶ 10; I at ¶ 15; J at ¶¶ 15, 16, 17, 19; K at ¶¶ 15, 17, 18, 19; L at ¶¶ 11, 12, 13; M at ¶¶ 15, 16, 17. Buying a new console, subscribing to new services, and paying increased prices for games are monetary harms that are reparable through money damages. *See American Passage Media*

16

*Corp. v. Cass Communications, Inc.,*, 750 F.2d 1470, 1473-74 (9th Cir. 1985) (monetary damages are not irreparable harm); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1122-23 (N.D. Cal. 2011), *aff'd on other grounds*, 554 F. App'x 598 (9th Cir. 2014) (dismissing merger challenge brought under Sections 7 and 16 of the Clayton Act, because allegations that the plaintiffs were threatened with higher ticket prices and paying more for less service could be remedied with monetary damages).

Plaintiffs' failure to show immediate, irreparable harm is yet another reason why their motion should be denied.

## **CONCLUSION**

For all or any of these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction Pending Appeal.

Dated: June 20, 2023                    Respectfully submitted,

By:   */s/ Valarie C. Williams*

Valarie C. Williams
Alston & Bird LLP

*Counsel for Defendant-Appellee
Microsoft Corporation*

17

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Federal Rules of Appellate Procedure 27(d). The brief is 17 pages. The type size and typeface comply with Rule 32(a)(5).

Dated: June 20, 2023                    By: */s/ Valarie C. Williams*
                                                 Valarie C. Williams

EXHIBIT A

No. 23-15846

In the

# United States Court of Appeals
## for the Ninth Circuit

———————————

DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSONY GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, AND IVAN CALVO-PÉREZ

*Plaintiff – Appellant*

v.

MICROSOFT CORPORATION, a Washington corporation

*Defendant – Appellee*

------------------------------------

**On Appeal from the United States District Court
for the Northern District of California**
Case no. 3:22-cv-08991-JSC
Honorable Jacqueline Scott Corley

———————————

**DECLARATION OF VALARIE C. WILLIAMS IN SUPPORT OF APPELLEE'S RESPONSE TO MOTION FOR TEMPORARY INJUNCTION PENDING APPEAL**

I, Valarie C. Williams, do hereby declare and state as follows:

1.      I am a partner with the law firm of Alston & Bird LLP, counsel of record for Appellee Microsoft Corporation, in both this appeal and the proceedings below. I have knowledge of the matters set forth in this declaration, and I could and would competently testify thereto if called to do so. I make this declaration in support of Microsoft's Response to Plaintiffs' Motion for Temporary Injunction Pending Appeal ("Microsoft's Response").

2.      Attached as Exhibit B to Microsoft's Response is a true excerpt of Plaintiffs' Amended Complaint filed in the proceedings below (found at ECF No. 84 on the docket below). There was also a sealed version of the Amended Complaint that was filed in the proceedings below, but the sealed material is not necessary for deciding the present motion.

3.      Attached as Exhibit C to Microsoft's Response is a true excerpt of Microsoft's January 18, 2022, Agreement and Plan of Merger with Anchorage Merger Sub Inc. and Activision Blizzard, Inc., a copy of which was filed in the proceedings below (ECF No. 163-10). The excerpt attached to Microsoft's Response includes an additional page that was errantly excluded from the excerpt below.

4.      Attached as Exhibit D to Microsoft's Response is a true excerpt of the transcript from a September 23, 2022 sworn investigational hearing of Christopher

Schnakenberg taken by the FTC, as filed under seal in the proceedings below (ECF No. 162-5).

5.      Attached as Exhibit E to Microsoft's Response is a true copy of a contract between Microsoft and Nintendo Co., Ltd., as filed under seal in the proceedings below (ECF No. 161-5).

6.      Attached as Exhibit F to Microsoft's Response is a true copy of a contract between Microsoft and NVIDIA Corporation, as filed under seal in the proceedings below (ECF No. 161-6).

7.      Attached as Exhibit G to Microsoft's Response is a true copy of the Declaration of Peter Leipzig used in support of the plaintiffs' motion for preliminary injunction in the case *Boardman et. al. v. Pacific Seafood Group, et. al.*, Case No. 1:15-cv-108-MC, and obtained from that docket at ECF No. 26. A copy of this declaration was filed on the docket in the proceedings below at ECF No. 163-2.

8.      Attached as Exhibits H, I, J, K, L, and M to Microsoft's Response are true copies of the Corrected Declarations of Curtis Burns, Jr., Dante DeMartini, Jessie Galvan, Hunter Jakupko, Beowulf Owen, and Daniel Loftus, as filed by Plaintiffs in the proceedings below in Support of Plaintiffs' Motion for Preliminary Injunction (ECF Nos. 145-149, 140).

9.      Attached as Exhibit N to Microsoft's Response is a true and accurate copy of the Declaration of Cindy Randall in Support of Microsoft's Motion to Seal

Portions of Opposition to Motion for Preliminary Injunction, as filed in the proceedings below (ECF No. 161-1).

10.     Attached as Exhibit O to Microsoft's Response is a true copy of an article printed from the following source: Erik Kain, *'Call Of Duty' 2023 Release Date And Beta Dates Leak Online*, Forbes, Feb. 13, 2023, https://www.forbes.com/sites/erikkain/2023/02/13/call-of-duty-2023-release-date-and-beta-dates-leak-online/?sh=365762a328d4.

11.     Attached as Exhibit P to Microsoft's Response is a true copy of a statement and declaration filed by non-party Activision Blizzard, Inc. in the proceedings below, in support of sealing certain material that included the document described above as Exhibit D (filed in the proceedings below at ECF 183 and 183-1).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 20, 2023.

By:  */s/ Valarie C. Williams*  _____
          Valarie C. Williams

# EXHIBIT B

Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:          jmalioto@aliotolaw.com
                twallace@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com
                kmcmahon@saverilawfirm.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JAKUPKO, DANIEL LOFTUS, BEOWULF OWEN, and IVAN CALVO-PÉREZ, <br><br> Plaintiffs, <br><br> v. <br><br> MICROSOFT CORPORATION, a Washington corporation, <br><br> Defendant. | Case No. 3:22-cv-08991-JSC <br><br> **AMENDED COMPLAINT TO PROHIBIT THE ACQUISITION OF ACTIVISION BLIZZARD BY MICROSOFT CORPORATION IN VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C.** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

BACKGROUND ................................................................................................................. 7

    A.    The Video Game Industry: From Innovative Distraction to Serious Business ..................... 7

    B.    Video Games: Platform and Content ................................................. 8

    C.    Video Game Consoles ........................................................................ 9

    D.    Multi-Game Content Library Subscriptions ................................... 11

    E.    Cloud-Gaming ................................................................................. 12

    F.    Triple-A Video Game Content ........................................................ 13

    G.    First-Party vs. Third-Party Gaming Content .................................. 15

    H.    Exclusivity, Partial Exclusivity, Timed Exclusivity ...................... 16

    I.    Gaming content drives demand for gaming platforms .................... 16

    J.    The Industry has Undergone Significant Consolidation ................. 17

    K.    Network Effects and Barriers to Entry ............................................ 20

PARTIES ........................................................................................................................... 21

    A.    Plaintiffs .......................................................................................... 21

    B.    Microsoft Corporation ..................................................................... 23

    C.    Activision Blizzard .......................................................................... 25

THE PROPOSED TRANSACTION ................................................................................ 27

COUNT 1 .......................................................................................................................... 28

VIOLATION OF SECTION 7 OF THE CLAYTON ACT (15 U.S.C. § 18) ................ 28

RELEVANT MARKETS .................................................................................................. 28

    A.    Triple-A Video Games .................................................................... 28

B. High-Performance Consoles ..................................................................... 32

C. Multi-Game Content Library Subscriptions ................................................ 37

D. Cloud-Gaming Subscription Services ......................................................... 40

E. Computer Operating Systems Market .......................................................... 42

GEOGRAPHIC MARKET ......................................................................................... 43

HORIZONTAL HARM TO COMPETITION ............................................................ 44

VERTICAL HARM TO COMPETITION ................................................................... 47

A. Triple -A Games Are Crucial Inputs to Gaming Platforms that Drive Demand ................. 49

B. Microsoft's Demonstrated And Admitted Incentive to Make Content Exclusive ............... 50

C. Activision's Gaming Content Is a Key Input ................................................. 54

D. Microsoft's "10-Year Deals" Do not Prevent Microsoft's Stated Foreclosure Strategy ...... 59

E. The Merger May Substantially Lessen Competition in the Console Market ...................... 62

F. The Merger May Substantially Lessen Competition in The Multi-Game Content Library Subscription Market ......................................................................................... 63

G. The Merger May Substantially Lessen Competition in The Cloud-Gaming Market .......... 65

H. The Merger May Substantially Lessen Competition in the Computer Operating Systems Market 67

PRAYER FOR RELIEF .............................................................................................. 68

content that takes advantage of that platform-specific feature. Similarly, when a new generation of consoles provides further graphics and computer-processing power, video game developers must understand those platform systems and features to be able to develop a game that takes advantage of those higher-processing features, and performs in a seamless manner. Game content developers expend significant time and cost in developing, optimizing, updating, and fixing video games for compatibility with each platform.

47.     For example, Activision Blizzard works closely with both Microsoft and Sony to develop and program its games for both the Xbox (Microsoft) and PlayStation (Sony) platforms. When Sony and Microsoft develop new console systems or new features, Sony and Microsoft disclose the specifications of those features to Activision Blizzard and other third-party game publishers and work closely with those game publishers to ensure that the game publishers are able to provide quality gaming content that works seamlessly with the new platform specifications and features and does not have bugs or problems from day one.

48.     Third-party content creators have significant business incentives in ensuring its games function at the highest level across every platform that the game is developed for.

C.  **Video Game Consoles**

49.     Video game consoles re stand-alone hardware devices designed to run video games specifically designed for them. They are operated with controllers, and most often plug into a TV for the display.

50.     Since the 1970's, competing video game console makers have periodically released consoles featuring the latest technological advances, with a new generation of consoles released approximately every five to ten years. Within the video game industry, competition for sales and technological supremacy is commonly referred to as the "console wars."

51.     For gamers who play games on gaming consoles today, the most popular options, Microsoft's Xbox, Sony's PlayStation, and Nintendo's Switch, come from the same trio of companies that have been manufacturing consoles for decades with no meaningful new competition from new entrants.

stream multiplayer games but single player games too, generating demand and conversation about those games.

109. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████

110. These direct and indirect network effects create a positive feedback loop, where the largest platforms attract the most quality content, which in turn attracts more consumers to the platform, thereby attracting more consumers (direct) and more quality content (indirect).

111. These network effects create often insurmountable barriers to entry, because a new platform manufacturer not only needs to create a desirable platform, but must also attract developers to make quality content for the platform. Without quality content, users are unlikely to adopt the platform, which in turn means that developers are unlikely to develop content for the platform.

## PARTIES

### A. Plaintiffs

112. The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is a consumer of video games, all with the express interest and intent in ensuring that the industry remains competitive, with the utmost innovation, output, choice, and price constraints, now and in the future. The potential acquisition of Activision Blizzard by Microsoft threatens loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of substantial competition within the video game industry.

113. Dante DeMartini is a video gamer located in San Francisco, California. Mr. DeMartini plays video games on the PlayStation console and on his personal computer using Windows OS. Mr. DeMartini plays or has purchased titles from Activision Blizzard, including multiple versions of *Call of Duty*, *World of Warcraft*, *Overwatch*, *Overwatch 2*, *Starcraft II*, *Diablo III*, and *Hearthstone*.

114.     Curtis Burns Jr. is a video gamer located in Oakland, California. Mr. Burns plays video games on the PlayStation console. Mr. Burns plays or has purchased titles from Activision Blizzard, including *Call of Duty*.

115.     Nicholas Elden is a video gamer located in Hoboken, New Jersey. Mr. Elden plays video games on Xbox, PlayStation, Nintendo Switch, and on mobile devices. Mr. Elden plays or has purchased titles from Activision Blizzard, including *Call of Duty*, *Diablo*, *Tony Hawk's*, and others.

116.     Jessie Galvan is a video gamer located in San Diego, California. Mr. Galvan plays video games on the PlayStation 5 console. Mr. Galvan plays or has purchased titles from Activision Blizzard, including *Call of Duty*.

117.     Christopher Giddings-LaFaye is a video gamer located in San Rafael, California. Mr. Giddings-LaFaye plays video games on his personal computer using Windows OS, as well as on a Mac. Mr. Giddings-LaFaye plays or has purchased titles from Activision Blizzard, including *Call of Duty* and *Overwatch*.

118.     Steve Herrera is a video gamer located in Oakland, California. Mr. Herrera plays video games on PlayStation consoles and the Nintendo Switch. Mr. Herrera plays or has purchased titles from Activision Blizzard, including *Call of Duty* titles, *Overwatch*, *Overwatch 2*, *Crash Bandicoot*, and *Marvel Ultimate Alliance*.

119.     Hunter Jakupko is a video gamer located in Los Angeles, California. Mr. Jakupko plays video games on a PlayStation console. Mr. Jakupko plays or has purchased titles from Activision Blizzard, including *Call of Duty: Modern Warfare 2*, *Call of Duty: Warzone 2*, *World of Warcraft*, *and Overwatch 2*.

120.     Daniel Loftus is a video gamer located in San Rafael, California. Mr. Loftus plays video games on PlayStation consoles. Mr. Loftus plays or has purchased titles from Activision Blizzard, including *Call of Duty* and *Overwatch*.

121.     Beowulf Owen is a video gamer located in Las Cruces, New Mexico. Mr. Owen plays video games on his personal computer using the Windows OS and Xbox consoles. Mr. Owen plays or has purchased titles from Activision Blizzard including *Call of Duty* and *Overwatch*.

122.     Ivan Calvo-Perez is a video gamer located in San Francisco, California. Mr. Calvo-Perez plays video games on the PlayStation consoles and on his personal computer using Windows OS. Mr. Calvo-Perez plays or has purchased titles from Activision Blizzard, including *Call of Duty*, *Diablo*, *Starcraft*, and *Warcraft 3*.

123.     Many of the Plaintiffs consider *Call of Duty* to be one of the most significant video game franchises for them. *Call of Duty* enables many of the Plaintiffs to stay connected with family and friends in different locations.

124.     Many of the Plaintiffs would purchase Microsoft platforms if *Call of Duty* or other Activision Blizzard content became exclusive or partially exclusive to Microsoft.

125.     Plaintiffs would all be harmed by increased prices or reduced quality and reduced output of Activision Blizzard games because they all are likely to purchase Activision Blizzard games in the future.

126.     Plaintiffs would all be harmed by reduction in quality and output of Triple-A games because Plaintiffs are all likely to purchase and enjoy Triple-A games in the future.

127.     Plaintiffs would all be harmed by increased prices and decreased quality and innovation of Microsoft's High-Performance Consoles, Microsoft's Multi-Game Content Library Subscription Services, Microsoft's Cloud Gaming services, or Microsoft's Windows operating system because Plaintiffs are all reasonably likely to purchase Microsoft's various gaming platforms in the future.

128.     Plaintiffs would all be harmed if Activision Blizzard's games are made exclusive or partially exclusive to Microsoft's platforms, including Xbox, Game Pass, XCloud, and Windows, because Plaintiffs are all reasonably likely to purchase such platforms in order to have access or first-tier access to Activision Blizzard games, even if Microsoft's platforms are less desirable than rival platforms but for the exclusivity or partial exclusivity of Activision Blizzard's games.

**B.  Microsoft Corporation**

129.     Defendant Microsoft Corporation is a corporation incorporated under the laws of the State of Washington with its principal place of business in Redmond, Washington. Microsoft is a global technology company. Microsoft sells computing devices, cloud systems and services, software, and other products to consumers and businesses.

████████████████████████████████████████████████████████

████████████████████

334.     Currently, Activision Blizzard has the incentive for its engineers to work diligently with all platforms to ensure their games function at the highest level and to highlight all of the next-gen platform features in their games at the highest quality. Microsoft cannot dispute that Microsoft has—at best—a conflict of interest in working closely with its rival platforms to ensure the best possible playing experience of Activision Blizzard's games, and may not devote sufficient resources or may withhold sufficient resources. Given Microsoft's strategies to date and based on internal documents, Microsoft may intentionally impede sufficient development on rival platforms, just as it did with *Redfall* when it purchased Bethesda, and numerous other Microsoft exclusive games.

335.     The 10-year deals do not provide commercially viable terms. For example, in the proposed 10-year deal offered to Sony, █████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

336.     The 10-year deal with Sony does not have any requirement for ████████████

██████████████████████████████████████████

████████ .

337.     In the 10-year agreement with Nintendo, Nintendo is required to pay Microsoft at minimum, ████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████

338.     Further, the 10-year deals only apply to ████████████████████████

███████████████████████████████████████

339.     Nor do the 10-year deals have any reasonable enforcement mechanism.

Dated: April 10, 2023

By:     */s/ Joseph R. Saveri*
           Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone:    (415) 500-6800
Facsimile:     (415) 395-9940
Email:        jsaveri@saverilawfirm.com
              swilliams@saverilawfirm.com
              czirpoli@saverilawfirm.com
              eabuchanan@saverilawfirm.com
              dseidel@saverilawfirm.com
              kmcmahon@saverilawfirm.com

Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (Sate Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:    (415) 434-8900
Facsimile:     (415) 434-9200
Email:        jmalioto@aliotolaw.com
              twallace@aliotolaw.com

Joseph M. Alioto Jr. (State Bar No. 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel: (415) 398-3800
Email:        joseph@aliotolegal.com

*Counsel for Plaintiffs*

# EXHIBIT C

EXECUTION VERSION

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**MICROSOFT CORPORATION,**

**ANCHORAGE MERGER SUB INC.**

**and**

**ACTIVISION BLIZZARD, INC.**

**Dated as of January 18, 2022**

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS & INTERPRETATIONS ................................................................. 1

    1.1    Certain Definitions ..................................................................................... 1
    1.2    Additional Definitions ............................................................................ 16
    1.3    Certain Interpretations .......................................................................... 18
    1.4    Disclosure Letters ................................................................................ 20

Article II THE MERGER ................................................................................................. 20

    2.1    The Merger ............................................................................................ 20
    2.2    The Effective Time ................................................................................ 21
    2.3    The Closing ........................................................................................... 21
    2.4    Effect of the Merger .............................................................................. 21
    2.5    Certificate of Incorporation and Bylaws .............................................. 21
    2.6    Directors and Officers .......................................................................... 22
    2.7    Effect on Capital Stock ......................................................................... 22
    2.8    Equity Awards ....................................................................................... 23
    2.9    Surrender of Shares .............................................................................. 26
    2.10   No Further Ownership Rights in Company Common Stock ................... 29
    2.11   Lost, Stolen or Destroyed Certificates ................................................. 29
    2.12   Required Withholding ............................................................................ 29
    2.13   Necessary Further Actions ................................................................... 29
    2.14   Adjustment to Merger Consideration ................................................... 29

Article III REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............................. 30

    3.1    Organization; Good Standing ................................................................ 30
    3.2    Corporate Power; Enforceability .......................................................... 30
    3.3    Company Board Approval; Opinion of the Company's Financial Advisor;
               Anti-Takeover Laws .............................................................................. 31
    3.4    Requisite Stockholder Approval ........................................................... 31
    3.5    Non-Contravention ................................................................................ 32
    3.6    Requisite Governmental Approvals ...................................................... 32
    3.7    Company Capitalization ........................................................................ 32
    3.8    Subsidiaries .......................................................................................... 34
    3.9    Company SEC Reports .......................................................................... 35
    3.10   Company Financial Statements; Internal Controls; Indebtedness ........ 35
    3.11   No Undisclosed Liabilities ..................................................................... 36
    3.12   Absence of Certain Changes; No Company Material Adverse Effect. ... 37
    3.13   Material Contracts ................................................................................ 37
    3.14   Real Property ........................................................................................ 38
    3.15   Environmental Matters ......................................................................... 39
    3.16   Intellectual Property; Privacy and Security ........................................... 39

-i-

# TABLE OF CONTENTS
## (Continued)

**Page**

| | | |
|---|---|---|
| 3.17 | Tax Matters. | 41 |
| 3.18 | Employee Plans | 44 |
| 3.19 | Labor and Employment Matters | 47 |
| 3.20 | Permits | 48 |
| 3.21 | Compliance with Laws | 48 |
| 3.22 | Anti-Money Laundering Laws | 50 |
| 3.23 | Legal Proceedings; Orders. | 50 |
| 3.24 | Insurance | 50 |
| 3.25 | Related Person Transactions | 51 |
| 3.26 | Brokers | 51 |
| 3.27 | Exclusivity of Representations and Warranties | 51 |

Article IV REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB ........ 52

| | | |
|---|---|---|
| 4.1 | Organization; Good Standing | 52 |
| 4.2 | Corporate Power; Enforceability | 53 |
| 4.3 | Non-Contravention | 53 |
| 4.4 | Requisite Governmental Approvals | 54 |
| 4.5 | Legal Proceedings; Orders | 54 |
| 4.6 | Ownership of Company Common Stock | 54 |
| 4.7 | Brokers | 54 |
| 4.8 | No Parent Vote or Approval Required | 55 |
| 4.9 | Sufficient Funds | 55 |
| 4.10 | Exclusivity of Representations and Warranties | 55 |

Article V INTERIM OPERATIONS OF THE COMPANY ............ 56

| | | |
|---|---|---|
| 5.1 | Affirmative Obligations | 56 |
| 5.2 | Forbearance Covenants | 56 |
| 5.3 | No Solicitation | 60 |
| 5.4 | No Control of the Company's Business | 65 |

Article VI ADDITIONAL COVENANTS ............ 65

| | | |
|---|---|---|
| 6.1 | Required Action and Forbearance; Efforts | 65 |
| 6.2 | Regulatory Approvals | 66 |
| 6.3 | Proxy Statement | 67 |
| 6.4 | Company Stockholder Meeting | 69 |
| 6.5 | Anti-Takeover Laws | 70 |
| 6.6 | Access | 70 |
| 6.7 | Section 16(b) Exemption | 71 |
| 6.8 | Directors' and Officers' Exculpation, Indemnification and Insurance | 71 |
| 6.9 | Employee Matters | 74 |
| 6.10 | Obligations of Merger Sub | 76 |
| 6.11 | Notification of Certain Matters | 76 |
| 6.12 | Public Statements and Disclosure | 77 |
| 6.13 | Specified and Transaction Litigation | 77 |

**TABLE OF CONTENTS**
**(Continued)**

**Page**

| | | |
|---|---|---|
| 6.14 | Stock Exchange Delisting; Deregistration | 77 |
| 6.15 | Additional Agreements | 78 |
| 6.16 | Senior Notes; Credit Facility | 78 |
| 6.17 | Parent Vote; Merger Sub. | 80 |
| 6.18 | Tax Matters | 80 |

Article VII CONDITIONS TO THE MERGER ......... 81

| | | |
|---|---|---|
| 7.1 | Conditions to Each Party's Obligations to Effect the Merger | 81 |
| 7.2 | Conditions to the Obligations of Parent and Merger Sub | 81 |
| 7.3 | Conditions to the Company's Obligations to Effect the Merger | 83 |

Article VIII TERMINATION, AMENDMENT AND WAIVER ......... 83

| | | |
|---|---|---|
| 8.1 | Termination | 83 |
| 8.2 | Manner and Notice of Termination; Effect of Termination | 85 |
| 8.3 | Fees and Expenses | 86 |
| 8.4 | Amendment | 87 |
| 8.5 | Extension; Waiver | 88 |

Article IX GENERAL PROVISIONS ......... 88

| | | |
|---|---|---|
| 9.1 | Survival of Representations, Warranties and Covenants | 88 |
| 9.2 | Notices | 88 |
| 9.3 | Assignment | 89 |
| 9.4 | Confidentiality | 89 |
| 9.5 | Entire Agreement | 90 |
| 9.6 | Third-Party Beneficiaries | 90 |
| 9.7 | Severability | 90 |
| 9.8 | Remedies | 90 |
| 9.9 | Governing Law | 91 |
| 9.10 | Consent to Jurisdiction | 91 |
| 9.11 | WAIVER OF JURY TRIAL | 92 |
| 9.12 | Counterparts | 92 |
| 9.13 | No Limitation | 92 |

Exhibit A – Fourth Amended and Restated Certificate of Incorporation of the Surviving Corporation

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "**Agreement**") is made and entered into as of January 18, 2022, by and among Microsoft Corporation, a Washington corporation ("**Parent**"), Anchorage Merger Sub Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("**Merger Sub**"), and Activision Blizzard, Inc., a Delaware corporation (the "**Company**"). Each of Parent, Merger Sub and the Company are sometimes referred to as a "**Party**." All capitalized terms that are used in this Agreement have the meanings given to them in <u>Article I</u>.

### RECITALS

A.    The Company Board has (i) determined that it is in the best interests of the Company and its stockholders to enter into this Agreement providing for the merger of Merger Sub with and into the Company (collectively with the other transactions contemplated by this Agreement, the "**Merger**") in accordance with the General Corporation Law of the State of Delaware (the "**DGCL**") upon the terms and subject to the conditions set forth herein and declared this Agreement advisable; (ii) approved the execution and delivery of this Agreement by the Company, the performance by the Company of its covenants and other obligations hereunder, and the consummation of the Merger upon the terms and subject to the conditions set forth herein; (iii) directed that the adoption of this Agreement be submitted to a vote at a meeting of the stockholders of the Company; and (iv) resolved to recommend that the stockholders of the Company vote in favor of the adoption of this Agreement in accordance with the DGCL.

B.    The boards of directors of each of Parent and Merger Sub have approved the execution and delivery of this Agreement, the performance of their respective covenants and other obligations hereunder, and the consummation of the Merger upon the terms and subject to the conditions set forth herein and the board of directors of Merger Sub has declared this Agreement advisable, directed that the adoption of this Agreement be submitted to a vote of Parent in its capacity as Merger Sub's sole stockholder and resolved to recommend that Parent vote in favor of the adoption of this Agreement in accordance with the DGCL.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, and intending to be legally bound hereby, Parent, Merger Sub and the Company agree as follows:

### ARTICLE I
### DEFINITIONS & INTERPRETATIONS

1.1    *Certain Definitions*. For all purposes of and pursuant to this Agreement, the following capitalized terms have the following respective meanings:

(a) "**Acceptable Confidentiality Agreement**" means a customary confidentiality agreement containing provisions that require any counterparty thereto (and any of its Affiliates and

representatives named therein) that receives non-public information of or with respect to the Company to keep such information confidential (it being understood that such agreement need not contain provisions that would prohibit the making of any Acquisition Proposal) and with other terms that are no less restrictive in the aggregate to such counterparty (and any of its Affiliates and representatives named therein) than the terms of the Confidentiality Agreement.

(b) "**Acquisition Proposal**" means any offer or proposal (other than an offer or proposal by Parent or Merger Sub) relating to an Acquisition Transaction.

(c) "**Acquisition Transaction**" means any transaction or series of related transactions (other than the Merger) involving:

(i) any direct or indirect purchase or other acquisition by any Person or "group" (as defined pursuant to Section 13(d) of the Exchange Act) of Persons, whether from the Company or any other Person(s), of securities representing more than 15% of the total outstanding voting power of the Company after giving effect to the consummation of such purchase or other acquisition, including pursuant to a tender offer or exchange offer by any Person or "group" of Persons that, if consummated in accordance with its terms, would result in such Person or "group" of Persons beneficially owning more than 15% of the total outstanding voting power of the Company after giving effect to the consummation of such tender or exchange offer;

(ii) any direct or indirect purchase (including by way of a merger, consolidation, business combination, recapitalization, reorganization, liquidation, dissolution or other transaction), license or other acquisition by any Person or "group" (as defined pursuant to Section 13(d) of the Exchange Act) of Persons of assets (including equity securities of any Subsidiary of the Company) constituting or accounting for more than 15% of the revenue, net income or consolidated assets of the Company and its Subsidiaries, taken as a whole; or

(iii) any merger, consolidation, business combination, recapitalization, reorganization, liquidation, dissolution or other transaction involving the Company (or any of its Subsidiaries whose business accounts for more than 15% of the revenue, net income or consolidated assets of the Company and its Subsidiaries, taken as a whole) in which the stockholders of the Company (or such Subsidiary) prior to such transaction will not own at least 85%, directly or indirectly, of the surviving company.

(d) "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract or otherwise.

(e) "**Anti-Money Laundering Laws**" means all applicable statutes, laws, rules, regulations or other requirements concerning anti-money laundering, proceeds of crime, combatting terrorism financing, and related financial recordkeeping and reporting, money transmission, money

service businesses, casinos, and other regulated financial institutions of all jurisdictions where the Company or any of its Subsidiaries conduct business.

(f) "**Antitrust Law**" means collectively the Sherman Antitrust Act of 1890, the Clayton Antitrust Act of 1914, the HSR Act, the Federal Trade Commission Act of 1914, and all other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or significant impediments or lessening of competition or the creation or strengthening of a dominant position through merger or acquisition, in any case that are applicable to the Merger.

(g) "**Audited Company Balance Sheet**" means the consolidated balance sheet (and the notes thereto) of the Company and its consolidated Subsidiaries as of December 31, 2020, set forth in the Company's Annual Report on Form 10-K filed by the Company with the SEC for the fiscal year ended December 31, 2020.

(h) "**Business Day**" means each day that is not a Saturday, Sunday or other day on which banks in the City of New York, New York are authorized or required by applicable Law to be closed.

(i) "**Chosen Courts**" means the Court of Chancery of the State of Delaware or, to the extent that the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, any state or federal court in the State of Delaware.

(j) "**Code**" means the Internal Revenue Code of 1986, as amended.

(k) "**Company Board**" means the Board of Directors of the Company.

(l) "**Company Capital Stock**" means the Company Common Stock and the Company Preferred Stock.

(m) "**Company Common Stock**" means the common stock, par value $0.000001 per share, of the Company.

(n) "**Company Intellectual Property**" means any Intellectual Property that is owned or purported to be owned by the Company or any of its Subsidiaries.

(o) "**Company Material Adverse Effect**" means any change, event, violation, inaccuracy, effect or circumstance (each, an "**Effect**") that, individually or taken together with all other Effects that exist or have occurred prior to the date of determination of the occurrence of the Company Material Adverse Effect, (a) has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole, or (b) would, or would reasonably be expected to, prevent or delay past the Termination Date the ability of the Company to consummate the transactions contemplated by this Agreement; provided that, in the case of clause (a) only, none of the following (by itself or when aggregated), to the extent occurring after the date of this Agreement, will be deemed to be or constitute a Company Material Adverse Effect or will be taken into account

-3-

when determining whether a Company Material Adverse Effect has occurred or may, would or could occur:

(i)     changes in general economic conditions in the United States or any other country or region in the world, or changes in conditions in the global economy generally;

(ii)     changes in conditions in the financial markets, credit markets or capital markets in the United States or any other country or region in the world, including (A) changes in interest rates or credit ratings in the United States or any other country; (B) changes in exchange rates for the currencies of any country; or (C) any suspension of trading in securities (whether equity, debt, derivative or hybrid securities) generally on any securities exchange or over-the-counter market operating in the United States or any other country or region in the world;

(iii)     any Effect generally affecting the industries in which the Company and its Subsidiaries conduct business;

(iv)     changes in regulatory, legislative or political conditions in the United States or any other country or region in the world;

(v)     any geopolitical conditions, outbreak of hostilities, acts of war, sabotage, terrorism or military actions (including any escalation or general worsening of any such hostilities, acts of war, sabotage, terrorism or military actions) in the United States or any other country or region in the world;

(vi)     earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions and other similar force majeure events in the United States or any other country or region in the world;

(vii)     any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other COVID-19 Measures that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 Measures, directive, pronouncement or guideline or interpretation thereof, or any material worsening of such conditions threatened or existing as of the date of this Agreement, in the United States or any other country or region in the world;

(viii)     the public announcement or pendency of this Agreement or the Merger, it being understood that the exceptions in this clause (viii) will not apply with respect to references to Company Material Adverse Effect of the representations and warranties contained in Section 3.5 (and in Section 7.2(a) and Section 8.1(e) to the extent related to such portions of such representations and warranties);

(ix)     any action taken or refrained from being taken, in each case, which Parent has expressly approved, consented to or requested in writing following the date of this Agreement or which is required by the terms of this Agreement;

-4-

(x)     changes or proposed changes in GAAP or other accounting standards or Law (or the enforcement or interpretation of any of the foregoing);

(xi)     changes in the price or trading volume of the Company Common Stock or Indebtedness of the Company and its Subsidiaries, in and of itself (it being understood that any cause of such change may, subject to the other provisions of this definition, be deemed to constitute a Company Material Adverse Effect and may be taken into consideration when determining whether a Company Material Adverse Effect has occurred);

(xii)     any failure, in and of itself, by the Company and its Subsidiaries to meet (A) any public estimates or expectations of the Company's revenue, earnings or other financial performance or results of operations for any period; or (B) any internal budgets, plans, projections or forecasts of its revenues, earnings or other financial performance or results of operations (it being understood that any cause of any such failure may, subject to the other provisions of this definition, be deemed to constitute a Company Material Adverse Effect and may be taken into consideration when determining whether a Company Material Adverse Effect has occurred);

(xiii)     any Transaction Litigation; and

(xiv)     any of the matters set forth in Section 1.1(o)(xiv) of the Company Disclosure Letter;

provided further, that with respect to clauses (i) through (vii) and (x) of this definition, such Effects shall be taken into account in determining whether a "Company Material Adverse Effect" has occurred or would reasonably be expected to occur, in each case, to the extent that such Effect has had a disproportionate adverse effect on the Company and its Subsidiaries relative to other companies operating in the industries in which the Company and its Subsidiaries conduct business, in which case only the incremental disproportionate adverse impact of such Effect may be taken into account in determining whether there has occurred a Company Material Adverse Effect.

(p)  "**Company Options**" means any outstanding options to purchase shares of Company Common Stock granted pursuant to any of the Company Stock Plans.

(q)  "**Company Preferred Stock**" means the preferred stock, par value $0.000001 per share, of the Company.

(r)  "**Company Products**" means any products, content and services of the Company or its Subsidiaries.

(s)  "**Company Stock-Based Award**" means each outstanding right of any kind, contingent or accrued, to receive or retain shares of Company Common Stock or receive a cash payment equal to or based on, in whole or in part, the value of Company Common Stock, in each case, granted pursuant to any of the Company Stock Plans (including performance shares, performance-based units, market stock units, restricted stock, restricted stock units, phantom units, deferred stock units and dividend equivalents), other than Company Options.

(t) "**Company Stock Plans**" means (i) the compensatory equity plans set forth in Section 1.1(t) of the Company Disclosure Letter and (ii) any other compensatory equity plans or Contracts of the Company, including option plans or Contracts assumed by the Company pursuant to a merger, acquisition or other similar transaction.

(u) "**Company Stockholders**" means the holders of shares of Company Common Stock.

(v) "**Continuing Employees**" means each individual who is an employee of the Company or any of its Subsidiaries immediately prior to the Effective Time and continues to be an employee of Parent or one of its Subsidiaries (including the Surviving Corporation) immediately following the Effective Time, but only for so long as such individual is so employed.

(w) "**Contract**" means any written contract, subcontract, note, bond, mortgage, indenture, lease, license, sublicense or other binding agreement.

(x) "**COVID-19**" means SARS-Co V-2, SARS-Co V-2 variants or COVID-19.

(y) "**COVID-19 Measures**" means quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, directives, restrictions, guidelines, responses or recommendations of or promulgated by any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, or other reasonable actions taken, in each case, in connection with or in response to COVID-19 and any evolutions, variants or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

(z) "**Credit Facility**" means the revolving credit facility commitments extended to the Company pursuant to the terms and conditions of the Credit Facility Agreement.

(aa) "**Credit Facility Agreement**" means the Credit Agreement, dated as of October 11, 2013, among the Company, the guarantors party thereto, Bank of America, N.A., as administrative agent, and the other parties thereto, as amended by the First Amendment, dated as of November 2, 2015, the Second Amendment, dated as of November 13, 2015, the Third Amendment, dated as of December 14, 2015, the Fourth Amendment, dated as of March 31, 2016, the Fifth Amendment, dated as of August 23, 2016, the Sixth Amendment, dated as of February 3, 2017, and the Seventh Amendment, dated as of August 24, 2018.

(bb) "**DOJ**" means the United States Department of Justice or any successor thereto.

(cc) "**Environmental Law**" means any Law relating to pollution, the protection of the environment (including ambient air, surface water, groundwater or land) or exposure of any Person with respect to Hazardous Substances or otherwise relating to the production, use, storage, treatment, transportation, recycling, disposal, discharge, release or other handling of any Hazardous Substances, or the investigation, clean-up or remediation thereof.

-6-

(dd) "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

(ee) "**Exchange Act**" means the Securities Exchange Act of 1934.

(ff) "**Exchange Ratio**" means a fraction (i) the numerator of which is the Merger Consideration and (ii) the denominator of which is the Parent Stock Price, rounded to four decimal places (with amounts 0.00005 and above rounded up).

(gg) "**Foreign Investment Law**" means any applicable Laws, including any state, national or multi-jurisdictional Laws, that are designed or intended to prohibit, restrict or regulate actions by foreigners to acquire interests in or control over domestic equities, securities, entities, assets, land or interests.

(hh) "**FTC**" means the United States Federal Trade Commission or any successor thereto.

(ii) "**GAAP**" means generally accepted accounting principles, consistently applied, in the United States.

(jj) "**Government Official**" means any officer or employee of a government or any department, agency or instrumentality thereof, or of a public international organization, or any person acting in an official capacity or on behalf of any such government, department, agency or instrumentality or for, or on behalf of, such public international organization, including but not limited to directors, officers, managers, employees and other agents of any enterprise owned directly or indirectly by a government or public international organization.

(kk) "**Governmental Authority**" means any government, governmental or regulatory (including any stock exchange or other self-regulatory organization) entity or body, department, commission, board, agency or instrumentality, and any court, tribunal, arbitrator or judicial body, in each case whether federal, state, county or provincial, and whether local or foreign.

(ll) "**Hazardous Substance**" means any substance, material or waste that is characterized or regulated by a Governmental Authority pursuant to any Environmental Law as "hazardous," "pollutant," "contaminant," "toxic" or "radioactive," including petroleum and petroleum products, polychlorinated biphenyls and friable asbestos.

(mm) "**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(nn) "**Indebtedness**" means any of the following liabilities or obligations: (i) indebtedness for borrowed money (including any principal, premium, accrued and unpaid interest, related expenses, prepayment penalties, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and all other amounts payable in connection therewith); (ii) liabilities evidenced by bonds, debentures, notes or other similar instruments or debt securities; (iii) liabilities pursuant to or in connection with letters of credit or banker's acceptances or

similar items (in each case whether or not drawn, contingent or otherwise); (iv) liabilities related to the deferred purchase price of property or services other than those trade payables incurred in the ordinary course of business; (v) liabilities arising from cash/book overdrafts; (vi) liabilities pursuant to capitalized leases; (vii) liabilities pursuant to conditional sale or other title retention agreements; (viii) liabilities with respect to vendor advances or any other advances; (ix) liabilities arising out of interest rate and currency derivative arrangements, forward contracts and any other arrangements designed to provide protection against fluctuations in interest or currency rates; (x) deferred purchase price liabilities related to past acquisitions; (xi) liabilities with respect to deferred compensation for services; (xii) liabilities arising in connection with earnouts, holdbacks, purchase price adjustments or other contingent payment obligations; (xiii) liabilities under sale-and-leaseback transactions, agreements to repurchase securities sold and other similar financing transactions; (xiv) liabilities arising from any breach of any of the foregoing; and (xv) indebtedness of the type referred to in clauses (i) through (xiv) of others guaranteed by the Company or any of its Subsidiaries or secured by any Lien.

(oo) "**Industry Standards**" means all industry and self-regulatory organization standards, to the extent applicable to the Company or its Subsidiaries, including, to the extent applicable to the Company or its Subsidiaries, standards of the Entertainment Software Ratings Board, the International Game Developers Association, Games Rating Authority and Video Standards Council.

(pp) "**Intellectual Property**" means all worldwide intellectual property rights, including all: (i) patents, trade secrets, know-how, confidential data, algorithms, inventions, methods and processes; (ii) copyrights (including copyrights in IT Assets) and database rights; (iii) moral rights, rights of publicity, "name and likeness" and similar rights; (iv) trademarks, service marks, corporate, trade and d/b/a names, logos, trade dress, domain names, social and mobile media identifiers and other source indicators, and all goodwill and all common law rights related thereto ("**Marks**"); and (v) registrations, applications, renewals, divisions, continuations, continuations-in-part, re-issues, re-examinations, foreign counterparts and equivalents of any of the foregoing.

(qq) "**Intervening Event**" means any positive change, effect, development, circumstance, condition, event or occurrence that (i) materially improves the business, assets or operations of the Company, (ii) as of the date of this Agreement was not known to the Company Board, or the consequences of which (based on facts known to the members of the Company Board as of the date of this Agreement) were not reasonably foreseeable as of the date of this Agreement, and (iii) is not related to an Acquisition Proposal.

(rr) "**IRS**" means the United States Internal Revenue Service or any successor thereto.

(ss) "**IT Assets**" means all hardware, firmware, middleware, software, databases, websites, applications, code, systems, networks and other computer, communication and information technology assets and equipment, including any of the foregoing incorporated into or used to support, host or service Company Products.

(tt) "**Knowledge**" of a Person, with respect to any matter in question, means (i) with respect to the Company, the actual knowledge of the individuals set forth on <u>Section 1.1(tt)</u> of the Company Disclosure Letter; and (ii) with respect to Parent, the actual knowledge of the individuals set forth on <u>Section 1.1(tt)</u> of the Parent Disclosure Letter, in each case after reasonable inquiry of those employees who would reasonably be expected to have actual knowledge of the matter in question.

(uu) "**Law**" means any federal, state, local, municipal, foreign, multi-national or other law, statute, constitution, ordinance, code, decree, order (including any executive order), directive, judgment, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority and any order or decision of an applicable arbitrator or arbitration panel.

(vv) "**Legal Proceeding**" means any claim, action, charge, lawsuit, litigation, hearing, investigation, inquiry, or other similarly formal legal proceeding, in each case, brought by or pending before any Governmental Authority, arbitrator, mediator or other tribunal.

(ww) "**Lien**" means any lien, encumbrance, pledge, security interest, claim and defect, covenant, imperfection, mortgage, deed of trust, hypothecation, encroachment, easement, use restriction, right-of-way, charge, adverse ownership interest, attachment, option or other right to acquire an interest, right of first refusal or conditional sale or similar restriction on transfer of title or voting and other restriction of title.

(xx) "**Material Contract**" means any of the following Contracts (but excluding Employee Plans):

(i) any "material contract" (as defined in Item 601(b)(10) of Regulation S-K promulgated by the SEC) with respect to the Company and its Subsidiaries, taken as whole;

(ii) material Contracts to which the Company or any of its Subsidiaries grants or is granted a license to use (or grants, is granted or shares rights or interests in or to use) any Intellectual Property, content, characters, features, data (excluding Personal Data) or IT Assets, including the following Contracts, to the extent they are material Contracts: (A) in-bound and out-bound licenses, royalty, consent, release, ownership, exclusivity, publishing, distribution, development, research and source code escrow agreements; (B) purchase options, rights of first refusal or negotiation, most favored nation, best price, price or content parity granted by the Company or any of its Subsidiaries; (C) hosting, support, maintenance, development, security and testing agreements; (D) sales and distribution agreements; (E) Contracts pursuant to which the Company or any of its Subsidiaries shares or makes available data (excluding Personal Data) generated in connection with usage of Company Products; and (F) non-disclosure and/or invention assignment agreements (for which only representative forms must be disclosed herein), in each case, other than (w) agreements for distribution of Company Products that would not be prohibited by <u>Section 5.2(t)</u> if entered into after the date hereof; (x) licenses granted by the Company or its Subsidiaries in the ordinary course of business or in connection with the provision or sale of any Company Products, in each case, consistent with past practice; (y) non-exclusive licenses of

commercially available software or other technology granted to the Company or its Subsidiaries; or (z) any licenses to software and materials licensed as open-source, public-source or freeware;

(iii)    any Contract containing any covenant (A) materially limiting the right of the Company or any of its Subsidiaries or their respective Affiliates to engage in any line of business or to compete with any Person in any line of business or in any geographic area that is material to the Company; (B) prohibiting the Company or any of its Subsidiaries from engaging in any material business with any Person or levying a material fine, charge or other payment for doing so; or (C) granting any material "most favored nation" status or similar pricing rights, granting exclusive material sales, distribution, marketing, streaming or other exclusive rights for a material period of time or granting material rights of first offer or rights of first refusal for a material period of time, in the case of each of clauses (A) through (C), other than any such Contracts that (x) are not material to the Company and its Subsidiaries, taken as a whole or (y) may be cancelled without liability to the Company or its Subsidiaries upon notice of thirty (30) days or less;

(iv)    any Contract (A) relating to the disposition or acquisition of more than $35,000,000 of assets by the Company or any of its Subsidiaries after the date of this Agreement other than in the ordinary course of business; (B) pursuant to which the Company or any of its Subsidiaries will acquire any ownership interest of more than $35,000,000 in any other Person or other business enterprise other than any Subsidiary of the Company; or (C) that is an agreement with respect to any acquisition or divestiture of more than $35,000,000 pursuant to which the Company or any of its Subsidiaries has continuing indemnification, "earn-out" or other contingent payment obligations;

(v)    any mortgages, indentures, guarantees, loans or credit agreements, security agreements or other Contracts relating to Indebtedness, in each case in excess of $25,000,000, other than (A) accounts receivables and payables in the ordinary course of business; (B) loans to wholly owned Subsidiaries of the Company in the ordinary course of business; and (C) extensions of credit to customers in the ordinary course of business;

(vi)    any Lease or Sublease set forth in Section 3.14(b) or Section 3.14(c) of the Company Disclosure Letter;

(vii)    any Contract providing for indemnification of any officer, director or employee by the Company or any of its Subsidiaries;

(viii)    any Contract that involves a material joint venture, joint development agreement (of Intellectual Property or otherwise), collaboration agreement, strategic alliance or strategic partnership, limited liability company, partnership or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any of the foregoing;

(ix)    any Contract containing any support, maintenance or service obligation on the part of the Company or any of its Subsidiaries that represents revenue in excess of $25,000,000

-10-

on an annual basis, other than those Contracts that may be cancelled without liability to the Company or any of its Subsidiaries upon notice of ninety (90) days or less;

(x)    any Contract that prohibits the payment of dividends or distributions in respect of the capital stock of the Company or any of its Subsidiaries, prohibits the pledging of the capital stock of the Company or any Subsidiary of the Company, prohibits the issuance of guarantees by the Company or any Subsidiary of the Company or grants any rights of first refusal or rights of first offer or similar rights or that limits or proposes to limit the ability of the Company or any of its Subsidiaries or Affiliates to sell, transfer, pledge or otherwise dispose of any assets or businesses in excess of $50,000,000;

(xi)    any Contract that contains a put, call or similar right pursuant to which the Company or any of its Subsidiaries could be required to purchase or sell, as applicable, any equity interests of any Person or assets, in each case with a value in excess of $35,000,000;

(xii)    any Contract that (A) is with a Significant Vendor or (B) resulted in payments by the Company or its Subsidiaries of more than $35,000,000 during the 12 months ended December 31, 2021 or is reasonably likely to result in payments by the Company or its Subsidiaries of more than $35,000,000 during the 12 months ending December 31, 2022;

(xiii)    any Contract that (A) is with a Significant Customer or (B) resulted in payments to the Company or its Subsidiaries of more than $25,000,000 during the 12 months ended December 31, 2021 or is reasonably likely to result in payments to the Company or its Subsidiaries of more than $25,000,000 during the 12 months ending December 31, 2022; and

(xiv)    any Contract that is an agreement that is material to the Company and its Subsidiaries, taken as a whole, with any Governmental Authority.

(yy)    "**Merger Consideration**" means $95.00 in cash, without interest.

(zz)    "**NASDAQ**" means The Nasdaq Stock Market.

(aaa)    "**Open Source License**" means any license for open source, public source or freeware software that is considered an open source software license by the Open Source Initiative or a free software license by the Free Software Foundation, including any version of the GNU General Public License, GNU Lesser/Library General Public License, Affero General Public License, Apache Software License, Mozilla Public License, BSD License, MIT License and Common Public License.

(bbb)    "**Owned Company Shares**" means the Cancelled Owned Company Shares and the Specified Owned Company Shares, collectively.

(ccc)    "**Parent Common Stock**" means the common stock, par value $0.00000625 per share, of Parent.

-11-

(ddd)   "**Parent Material Adverse Effect**" means any Effect that would, or would reasonably be expected to, prevent or materially impede or materially delay, or prevents or materially impedes or materially delays, the consummation by Parent or Merger Sub of the Merger and the other transactions contemplated by this Agreement.

(eee)   "**Parent Stock Plan**" means Parent's 2001 Stock Plan, as amended and restated.

(fff)   "**Parent Stock Price**" means an amount equal to the volume weighted average price per share rounded to four decimal places (with amounts 0.00005 and above rounded up) of Parent Common Stock on NASDAQ (as reported by Bloomberg L.P. or another authoritative source mutually selected by Parent and the Company) for the five consecutive trading days ending with the last trading day ending immediately prior to the Closing Date.

(ggg)   "**Permitted Liens**" means any of the following: (i) liens for Taxes, assessments and governmental charges or levies either not yet delinquent or that are being contested in good faith and by appropriate proceedings and for which appropriate reserves have been established to the extent required by GAAP; (ii) mechanics, carriers', workmen's, warehouseman's, repairmen's, materialmen's or other similar liens or security interests that are not yet due or that are being contested in good faith and by appropriate proceedings; (iii) third Person leases, subleases and licenses (other than capital leases and leases underlying sale and leaseback transactions) entered into in the ordinary course of business; (iv) pledges or deposits to secure obligations pursuant to workers' compensation Laws or similar legislation or to secure public or statutory obligations; (v) pledges and deposits to secure the performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature, in each case in the ordinary course of business; (vi) defects, imperfections or irregularities in title, easements, covenants and rights of way (unrecorded and of record) and other similar liens (or other encumbrances of any type), in each case that do not, and are not reasonably likely to, adversely affect in any material respect the current use or occupancy of the applicable property owned, leased, used or held for use by the Company or any of its Subsidiaries; (vii) zoning, building and other similar codes or restrictions which are not violated in any material respect by the current use or occupancy of the real property subject thereto; (viii) liens the existence of which are disclosed in the notes to the consolidated financial statements of the Company included in the Company SEC Reports filed as of the date of this Agreement; (ix) licenses to Company Intellectual Property entered into in the ordinary course of business consistent with past practice; (x) any other liens that do not secure a liquidated amount, that have been incurred or suffered in the ordinary course of business, and that would not, individually or in the aggregate, have a Company Material Adverse Effect; and (xi) statutory, common law or contractual liens of landlords under Leases or liens against the fee interests of the landlord or owner of any Leased Real Property.

(hhh)   "**Person**" means any individual, corporation (including any non-profit corporation), limited liability company, joint stock company, general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, firm, Governmental Authority or other enterprise, association, organization or entity.

(iii)"**Personal Data**" means all information that identifies, is capable of identifying (directly or indirectly, either alone or in combination with other data) or otherwise relates to an individual person or household, personal or personally identifiable data or information, including personal data (or the equivalent) as defined in any applicable Law.

(jjj)"**Privacy Laws**" means all U.S., state and foreign Laws relating to Personal Data, including the European Union's General Data Protection Regulation and ePrivacy Directive, the UK General Data Protection Regulation, the California Consumer Privacy Act, the Illinois Biometric Information Privacy Act, the Children's Online Privacy Protection Act, the Personal Information Protection and Electronic Documents Act 2000, the UK Data Protection Act of 2018, and any other Laws governing the privacy, security, integrity, accuracy, Processing or other protection of Personal Data.

(kkk) "**Privacy Policies**" means all (i) policies, representations, and statements relating to Personal Data and/or the Processing thereof, including those posted or made publicly available or provided to end users, employees or business partners in any media by the Company or its Subsidiaries and (ii) Industry Standards governing Personal Data or cybersecurity.

(lll)"**Process**" or "**Processing**" means, with respect to data (including Personal Data), the use, collection, creation, receipt, processing, aggregation, storage, maintenance, adaption, alteration, transfer, transmission, disclosure, dissemination, combination, erasure, destruction, de-identification, pseudonymizing or anonymizing of such data, any other operation or set of operations that is performed on data or on sets of data, in each case, whether or not by automated means, and any other form of processing, including as defined by or under any applicable Law.

(mmm)"**Sarbanes-Oxley Act**" means the Sarbanes-Oxley Act of 2002.

(nnn) "**SEC**" means the United States Securities and Exchange Commission or any successor thereto.

(ooo) "**Securities Act**" means the Securities Act of 1933.

(ppp) "**Senior Notes**" means the (i) 3.400% senior notes due September 15, 2026 issued pursuant to the Indenture, dated as of September 19, 2016, by and among the Company, the Trustee, and the guarantors party thereto (the "**Indenture**"), (ii) 3.400% senior notes due June 15, 2027 issued pursuant to the Base Indenture, dated as of May 26, 2017, between the Company and the Trustee (the "**Base Indenture**"), as supplemented by the First Supplemental Indenture, dated as of May 26, 2017, between the Company and the Trustee (together with the Base Indenture, the "**First Supplemental Indenture**"), (iii) 1.350% senior notes due September 15, 2030 issued pursuant to the Base Indenture, as supplemented by the Second Supplemental Indenture, dated as of August 10, 2020, between the Company and the Trustee (together with the Base Indenture, the "**Second Supplemental Indenture**"), (iv) 4.500% senior notes due June 15, 2047 issued pursuant to the First Supplemental Indenture and (v) 2.500% senior notes due September 15, 2050 issued pursuant to the Second Supplemental Indenture.

-13-

(qqq) "**Significant Customer**" means each of the 10 largest customers to the Company and its Subsidiaries (or groups of related customers) by accounts receivable, taken as a whole, at December 31, 2021, which customers are set forth on Section 1.1(qqq) of the Company Disclosure Letter.

(rrr) "**Significant Vendor**" means (i) each of the 10 largest suppliers, vendors, content partners or service providers to the Company and its Subsidiaries (or groups of related vendors or suppliers) by payments on invoices, taken as a whole, during the 12-month period ended on December 31, 2021, which vendors are set forth on Section 1.1(rrr) of the Company Disclosure Letter; and (ii) any other material vendors or suppliers of the Company with material agreements with the Company who are data center, data processing, cloud or hosting vendors.

(sss) "**Specified Litigation**" means any of the matters set forth on Section 1.1(sss) of the Company Disclosure Letter.

(ttt)"**Specified OSS License**" means an Open Source License that (i) requires that source code be licensed, distributed, released, conveyed or made available if such software (or any software incorporating, derived from, linking to or with the same) is licensed, distributed, modified, released, conveyed or otherwise made available or accessible to any third party ("**Distributed**"); (ii) requires that the right to make derivative works of such software be granted to any licensee of such software if any such software is Distributed to other Persons; (iii) requires that the software be Distributed to any licensee if it is Distributed to other Persons and that each licensee further Distribute such software on the same license terms if it is Distributed and/or (iv) expressly grants a patent license, covenant not to sue or non-assertion covenant of such license if any software governed by such license is Distributed to other Persons.

(uuu) "**Specified Owned Company Shares**" means all shares of Company Common stock held by the Specified Subsidiary as of immediately prior to the Effective Time.

(vvv) "**Specified Subsidiary**" means Amber Holding Subsidiary Co., a Delaware corporation and a wholly owned Subsidiary of the Company.

(www) "**Subsidiary**" of any Person means (i) a corporation more than 50% of the combined voting power of the outstanding voting stock of which is owned, directly or indirectly, by such Person or by one or more other Subsidiaries of such Person or by such Person and one or more other Subsidiaries of such Person; (ii) a partnership of which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the general partner and has the power to direct the policies, management and affairs of such partnership; (iii) a limited liability company of which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries of such Person, directly or indirectly, is the managing member and has the power to direct the policies, management and affairs of such company; or (iv) any other Person (other than a corporation, partnership or limited liability company) in which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries of such Person, directly or indirectly, has at least a majority ownership or the power to direct the policies, management and affairs thereof (including by

-14-

contract). Notwithstanding the foregoing, the entities set forth on <u>Section 1.1(www)</u> of the Company Disclosure Letter (each, a "**Specified JV Entity**" and together, the "**Specified JV Entities**") shall not be deemed to be Subsidiaries of the Company, except that with respect to the definition of Company Material Adverse Effect, representations and warranties set forth in <u>3.5(a)</u>, <u>3.5(c)</u>, <u>3.6</u>, <u>3.8</u>, <u>3.20</u>, <u>3.21</u>, <u>3.22</u>, and <u>3.23</u> and the covenants set forth in <u>Section 5.2</u>, the term "Subsidiary" in such definition, representations and warranties and covenants shall be deemed to include the Specified JV Entities; <u>provided</u>, that such representations and warranties shall be deemed to be made to the Knowledge of the Company insofar as they relate to any Specified JV Entity.

(xxx)    "**Superior Proposal**" means any bona fide written Acquisition Proposal for an Acquisition Transaction that the Company Board has determined in good faith (after consultation with the Company's financial advisor and outside legal counsel) is on terms that would be more favorable, from a financial point of view, to the Company Stockholders (in their capacity as such) than the Merger (taking into account any revisions to this Agreement made or proposed in writing by Parent prior to the time of such determination and after taking into account those factors and matters deemed relevant in good faith by the Company Board, including the identity of the Person making the proposal, the conditionality of such proposal, the likelihood of consummation in accordance with the terms of such proposal, and the legal, financial (including the financing terms), regulatory, timing and other aspects of such proposal). For purposes of the reference to an "Acquisition Proposal" in this definition, all references to "15%" in the definition of "Acquisition Transaction" will be deemed to be references to "50%."

(yyy)    "**Tax Contest**" means any inquiry, audit, examination, hearing, trial, appeal, or other administrative or judicial proceeding with respect to any Taxes or Tax Returns of Company.

(zzz)    "**Tax Group**" means any "affiliated group" of corporations within the meaning of Section 1504 of the Code (or any similar affiliated, combined, consolidated, or unitary group or arrangement for group relief for state, local, or foreign Tax purposes).

(aaaa)    "**Taxes**" means any United States federal, state, local and non-United States taxes, charges, fees, levies, imposts, duties, and other similar assessments or charges of any kind whatsoever, imposed by any Governmental Authority in the nature of a tax, including gross receipts, income, profits, sales, use, occupation, value added, ad valorem, transfer, franchise, withholding, payroll, employment, excise and property taxes, assessments and any similar government charges and impositions of any kind, together with all interest, penalties and additions imposed with respect to such amounts.

(bbbb)    "**Transaction Litigation**" means any Legal Proceeding against the Company or any of its Subsidiaries or Affiliates or directors or otherwise relating to, involving or affecting the Company or any of its Subsidiaries or Affiliates, in each case in connection with, arising from or otherwise relating to the Merger or any other transaction contemplated by this Agreement, including any Legal Proceeding alleging or asserting any misrepresentation or omission in the Proxy Statement.

-15-

(cccc) "**Trustee**" means Wells Fargo Bank, National Association, as trustee under the Indenture, the Base Indenture, the First Supplemental Indenture or the Second Supplemental Indenture, as applicable.

(dddd) "**WARN**" means the United States Worker Adjustment and Retraining Notification Act and any similar U.S. state or U.S. local Law.

1.2 *Additional Definitions*. The following capitalized terms have the respective meanings given to them in the respective Sections of this Agreement set forth opposite each of the capitalized terms below:

| Term | Section Reference |
|---|---|
| Agreement | Preamble |
| Alternative Acquisition Agreement | 5.3(a) |
| Assumed Company Option | 2.8(c)(i) |
| Assumed Company Stock-Based Award | 2.8(c)(ii) |
| Base Indenture | 1.1(ppp) |
| Book-Entry Shares | 2.9(b) |
| Burdensome Condition | 6.2(b) |
| Bylaws | 3.1 |
| Cancelled Owned Company Shares | 2.7(a)(ii) |
| Capitalization Date | 3.7(a) |
| Certificate of Merger | 2.2 |
| Certificates | 2.9(b) |
| Charter | 3.1 |
| Closing | 2.3 |
| Closing Date | 2.3 |
| Collective Bargaining Agreement | 3.19(a) |
| Company | Preamble |
| Company Board Recommendation | 3.3(a) |
| Company Board Recommendation Change | 5.3(c)(i) |
| Company Disclosure Letter | 1.4(a) |
| Company Employee | 3.18(i) |
| Company Plans | 6.9(b) |
| Company Recent SEC Reports | Article III |
| Company SEC Reports | 3.9 |
| Company Securities | 3.7(d) |
| Company Stockholder Meeting | 6.4(a) |
| Company Termination Fee | 8.3(b)(i) |
| Comparable Plans | 6.9(b) |
| Confidentiality Agreement | 9.4 |
| Consent | 3.6 |
| D&O Insurance | 6.8(c) |
| DGCL | Recitals |

-16-

| Term | Section Reference |
|------|-------------------|
| Dissenting Company Shares | 2.7(b)(i) |
| Effect | 1.1(o) |
| Effective Time | 2.2 |
| Electronic Delivery | 9.12 |
| Employee Plans | 3.18(a) |
| ERISA Affiliate | 3.18(a) |
| Exchange Fund | 2.9(a) |
| FinCEN | 3.21(d) |
| First Supplemental Indenture | 1.1(ooo) |
| Indemnified Persons | 6.8(a) |
| Indenture | 1.1(ppp) |
| Initial Termination Date | 8.1(c) |
| Injunction | 8.1(b) |
| International Employee Plan | 3.18(a) |
| Lease | 3.14(b) |
| Leased Real Property | 3.14(b) |
| Maximum Annual Premium | 6.8(c) |
| Merger | Recitals |
| Merger Sub | Preamble |
| New Plans | 6.9(c) |
| Notice Period | 5.3(d)(ii)(3) |
| OFAC | 3.21(c) |
| Old Plans | 6.9(c) |
| Owned Real Property | 3.14(a) |
| Parent | Preamble |
| Parent Disclosure Letter | 1.4(b) |
| Parent Qualified Plan | 6.9(d) |
| Parent Recent SEC Reports | Article IV |
| Parent Termination Fee | 8.3(c)(i) |
| Party | Preamble |
| Paying Agent | 2.9(a) |
| Payoff Letter | 6.16(d) |
| Permits | 3.20 |
| Proxy Statement | 6.3(a) |
| Representatives | 5.3(a) |
| Repurchase Transaction | 6.16(c) |
| Repurchase Transaction Notice | 6.16(c) |
| Requisite Stockholder Approval | 3.4 |
| Revolving Credit Facility Termination | 6.16(d) |
| Sanctioned Countries | 3.21(c) |
| Sanctioned Person | 3.21(c) |
| Sanctions | 3.21(c) |
| Second Supplemental Indenture | 1.1(ppp) |

| Term | Section Reference |
|---|---|
| Sublease | 3.14(c) |
| Surrendered Company Stock-Based Award | 2.8(a) |
| Surviving Corporation | 2.1 |
| Tax Returns | 3.17(a)(i) |
| Termination Date | 8.1(c) |

1.3    *Certain Interpretations*.

(a)  When a reference is made in this Agreement to an Article or a Section, such reference is to an Article or a Section of this Agreement unless otherwise indicated. When a reference is made in this Agreement to a Schedule or Exhibit, such reference is to a Schedule or Exhibit to this Agreement, as applicable, unless otherwise indicated.

(b)  When used herein, (i) the words "hereof," "herein" and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement; and (ii) the words "include," "includes" and "including" will be deemed in each case to be followed by the words "without limitation."

(c)  Unless the context otherwise requires, "neither," "nor," "any," "either" and "or" are not exclusive.

(d)  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and does not simply mean "if."

(e)  When used in this Agreement, references to "$" or "Dollars" are references to U.S. dollars.

(f)  The meaning assigned to each capitalized term defined and used in this Agreement is equally applicable to both the singular and the plural forms of such term, and words denoting any gender include all genders. Where a word or phrase is defined in this Agreement, each of its other grammatical forms has a corresponding meaning.

(g)  When reference is made to any party to this Agreement or any other agreement or document, such reference includes such party's successors and permitted assigns. References to any Person include the successors and permitted assigns of that Person.

(h)  Unless the context otherwise requires, all references in this Agreement to the Subsidiaries of a Person will be deemed to include all direct and indirect Subsidiaries of such entity.

(i)  A reference to any specific legislation or to any provision of any legislation includes any amendment to, and any modification, re-enactment or successor thereof, any legislative provision substituted therefor and all rules, regulations and statutory instruments issued thereunder or pursuant thereto, except that, for purposes of any representations and warranties in this Agreement that are made as a specific date, references to any specific legislation will be deemed to refer to such

-18-

legislation or provision (and all rules, regulations and statutory instruments issued thereunder or pursuant thereto) as of such date. References to any agreement or Contract are to that agreement or Contract as amended, modified or supplemented from time to time.

(j)  Except as otherwise provided herein, all accounting terms used herein will be interpreted, and all accounting determinations hereunder will be made, in accordance with GAAP.

(k)  The table of contents and headings set forth in this Agreement are for convenience of reference purposes only and will not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or any term or provision hereof.

(l)  References to "from" or "through" any date mean, unless otherwise specified, from and including or through and including such date, respectively.

(m) The measure of a period of one month or year for purposes of this Agreement will be the date of the following month or year corresponding to the starting date. If no corresponding date exists, then the end date of such period being measured will be the next actual date of the following month or year (for example, one month following February 18 is March 18 and one month following March 31 is May 1).

(n)  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and therefore waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

(o)  No summary of this Agreement or any Exhibit, Schedule or other document delivered herewith prepared by or on behalf of any Party will affect the meaning or interpretation of this Agreement or such Exhibit or Schedule.

(p)  The information contained in this Agreement and in the Company Disclosure Letter and the Parent Disclosure Letter is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third Person of any matter whatsoever, including (i) any violation of Law or breach of contract; or (ii) that such information is material or that such information is required to be referred to or disclosed under this Agreement.

(q)  The representations and warranties in this Agreement are the product of negotiations among the Parties and are for the sole benefit of the Parties. Any inaccuracies in such representations and warranties are subject to waiver by the Parties in accordance with Section 8.5 without notice or liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the Parties of risks associated with particular matters regardless of the knowledge of any of the Parties. Consequently, Persons other than the Parties may not rely on the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

-19-

(r)  Documents or other information or materials will be deemed to have been "made available" by the Company if such documents, information or materials have been (i) continuously made accessible to Parent by 4:00 p.m., Pacific time, on the date of this Agreement by means of a virtual data room managed by the Company at www.datasite.com; or (ii) delivered or provided to Parent or its Affiliates or Representatives by 4:00 p.m., Pacific time, on the date of this Agreement.

1.4    *Disclosure Letters*.

(a)    The information set forth in the disclosure letter delivered by the Company to Parent and Merger Sub on the date of this Agreement (the "**Company Disclosure Letter**") will be disclosed under separate and appropriate Section and subsection references that correspond to the Sections and subsections of Article III and Article V to which such information relates. The information set forth in each Section or subsection of the Company Disclosure Letter will be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (i) the representations and warranties (or covenants, as applicable) of the Company that are set forth in the corresponding Section or subsection of this Agreement; and (ii) any other representations and warranties (or covenants, as applicable) of the Company that are set forth in this Agreement, but in the case of this clause (ii) only if the relevance of that disclosure as an exception to (or a disclosure for purposes of) such other representations and warranties (or covenants, as applicable) is reasonably apparent on the face of such disclosure.

(b)    The information set forth in the disclosure letter delivered by Parent and Merger Sub to the Company on the date of this Agreement (the "**Parent Disclosure Letter**") will be disclosed under separate and appropriate Section and subsection references that correspond to the Sections and subsections of Article IV to which such information relates. The information set forth in each Section or subsection of the Parent Disclosure Letter will be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (i) the representations and warranties (or covenants, as applicable) of Parent and Merger Sub that are set forth in the corresponding Section or subsection of this Agreement; and (ii) any other representations and warranties (or covenants, as applicable) of Parent and Merger Sub that are set forth in this Agreement, but in the case of this clause (ii) only if the relevance of that disclosure as an exception to (or a disclosure for purposes of) such other representations and warranties (or covenants, as applicable) is reasonably apparent on the face of such disclosure.

## ARTICLE II
## THE MERGER

2.1    *The Merger*. Upon the terms and subject to the conditions set forth in this Agreement and the applicable provisions of the DGCL, on the Closing Date, (a) Merger Sub will be merged with and into the Company; (b) the separate corporate existence of Merger Sub will thereupon cease; and (c) the Company will continue as the surviving corporation of the Merger and a Subsidiary of Parent. The Company, as the surviving corporation of the Merger, is sometimes referred to herein as the "**Surviving Corporation**."

2.2     *The Effective Time*. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Parent, Merger Sub and the Company will cause the Merger to be consummated pursuant to the DGCL by filing a certificate of merger (the "**Certificate of Merger**") with the Secretary of State of the State of Delaware in accordance with the applicable provisions of the DGCL (the time of such filing and acceptance with the Secretary of State of the State of Delaware, or such later time as may be agreed in writing by Parent, Merger Sub and the Company and specified in the Certificate of Merger in accordance with the DGCL, being referred to herein as the "**Effective Time**").

2.3     *The Closing*. The consummation of the Merger will take place at a closing (the "**Closing**") to occur at (a) 6:00 a.m., Pacific time by remote communication and by the exchange of signature pages by electronic transmission or, to the extent such exchange is not practicable or the Parties otherwise agree in writing, at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, on a date to be agreed upon by Parent, Merger Sub and the Company that is no later than the third Business Day after the satisfaction or waiver (to the extent permitted hereunder) of the last to be satisfied or waived of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver (to the extent permitted hereunder) of such conditions); or (b) such other time, location and date as Parent, Merger Sub and the Company mutually agree in writing. The date on which the Closing actually occurs is referred to as the "**Closing Date**."

2.4     *Effect of the Merger*. At the Effective Time, the effect of the Merger will be as provided in this Agreement and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time all (a) of the property, rights, privileges, powers and franchises of the Company and Merger Sub will vest in the Surviving Corporation; and (b) debts, liabilities and duties of the Company and Merger Sub will become the debts, liabilities and duties of the Surviving Corporation.

2.5     *Certificate of Incorporation and Bylaws*.

(a)     *Certificate of Incorporation*. At the Effective Time, the certificate of incorporation of the Company as in effect immediately prior to the Effective Time shall be amended and restated in its entirety in the form attached hereto as Exhibit A and, as so amended, shall be the certificate of incorporation of the Surviving Corporation until, subject to Section 6.8(a), thereafter amended in accordance with the applicable provisions of the DGCL and such certificate of incorporation.

(b)     *Bylaws*. The Parties will take all necessary actions so that at the Effective Time, the bylaws of Merger Sub, as in effect immediately prior to the Effective Time, will be the bylaws of the Surviving Corporation (except that the title thereof shall read "Bylaws of Activision Blizzard, Inc.") until, subject to Section 6.8(a), thereafter amended in accordance with the applicable provisions of the DGCL, the certificate of incorporation of the Surviving Corporation and such bylaws.

-21-

adoption, approval or recommendation with respect to such Acquisition Proposal; or (3) a Company Board Recommendation Change.

(g) *Breach by Representatives*. The Company agrees that any action taken by any Representative (other than any employee or consultant of the Company who is not at the senior vice president level or above or other officer of the Company) of the Company that, if taken by the Company, would be a breach of this Section 5.3, then such action will be deemed to constitute a breach by the Company of this Section 5.3.

5.4     *No Control of the Company's Business*. The Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give Parent or Merger Sub, directly or indirectly, the right to control or direct the business or operations of the Company or its Subsidiaries at any time prior to the Effective Time. Prior to the Effective Time, the Company and its Subsidiaries will exercise, consistent with the terms, conditions and restrictions of this Agreement, complete control and supervision over their own business and operations.

# ARTICLE VI
# ADDITIONAL COVENANTS

6.1     *Required Action and Forbearance; Efforts*.

(a) *Reasonable Best Efforts*. Upon the terms and subject to the conditions set forth in this Agreement and provided that at all times the provisions of Section 6.2 shall govern the matters set forth therein, Parent and Merger Sub, on the one hand, and the Company, on the other hand, will use their respective reasonable best efforts to (A) take (or cause to be taken) all actions; (B) do (or cause to be done) all things; and (C) assist and cooperate with the other Parties in doing (or causing to be done) all things, in each case as are necessary, proper or advisable pursuant to applicable Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the Merger, including by using reasonable best efforts to:

(i)     cause the conditions to the Merger set forth in Article VII to be satisfied;

(ii)     (1) seek to obtain all consents, waivers, approvals, orders and authorizations from Governmental Authorities; and (2) make all registrations, declarations and filings with Governmental Authorities, in each case that are necessary or advisable to consummate the Merger; and

(iii)     (1) seek to obtain all consents, waivers and approvals and (2) deliver all notifications pursuant to any Material Contracts (or other applicable Contracts of the Company or its Subsidiaries) in connection with this Agreement and the consummation of the Merger so as to seek to maintain and preserve the benefits to the Surviving Corporation of such Material Contracts (or other applicable Contracts of the Company or its Subsidiaries) as of and following the consummation of the Merger, in each of cases (1) and (2) to the extent directed to do so by Parent following consultation therewith.

and do, or cause to be done, all things reasonably necessary, proper or advisable on its part pursuant to applicable Law and the rules and regulations of NASDAQ to cause (a) the delisting of the Company Common Stock from NASDAQ as promptly as practicable after the Effective Time; and (b) the deregistration of the Company Common Stock pursuant to the Exchange Act as promptly as practicable after such delisting.

6.15 *Additional Agreements*. If at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement or to vest the Surviving Corporation with full title to all properties, assets, rights, approvals, immunities and franchises of either of the Company or Merger Sub, then the proper officers and directors of each Party will use their reasonable best efforts to take such action. Without limiting the foregoing, the Company shall take the actions set forth on <u>Section 6.15</u> of the Company Disclosure Letter.

6.16 *Senior Notes; Credit Facility.*

(a) *Senior Notes*. Notwithstanding anything to the contrary in this Agreement, prior to the Effective Time, the Company shall give any notices and take all other actions necessary in accordance with the terms of the Indenture, the First Supplemental Indenture, the Second Supplemental Indenture and the Senior Notes, which actions shall include, without limitation, the Company (or its Subsidiaries) (i) giving any notices that may be required in connection with the Merger and the other transactions contemplated by this Agreement, (ii) preparing any supplemental indentures required in connection with the Merger and the other transactions contemplated by this Agreement and the consummation thereof to be executed and delivered to the Trustee at or prior to the Effective Time, in form and substance reasonably satisfactory to the Trustee and Parent, and (iii) delivering any opinions of counsel required to be delivered prior to the Effective Time and any officer's certificates or other documents or instruments, as may be necessary to comply with all of the terms and conditions of the Indenture, the First Supplemental Indenture and the Second Supplemental Indenture in connection with the Merger and the other transactions contemplated by this Agreement, provided that opinions of counsel required by the Indenture, the First Supplemental Indenture or the Second Supplemental Indenture, as may be necessary to comply with all of the terms and conditions of the Indenture, the First Supplemental Indenture or the Second Supplemental Indenture in connection with the Merger and the other transactions contemplated by this Agreement shall be delivered by Parent and its counsel to the extent required to be delivered at or after the Effective Time.

(b) *Notifications under Senior Notes*. The Company shall provide Parent and its counsel reasonable opportunity to review and comment on any notices, certificates, press releases, supplemental indentures, legal opinions, officer's certificates or other documents or instruments required to be delivered pursuant to or in connection with the Indenture, the First Supplemental Indenture, the Second Supplemental Indenture or the Senior Notes in connection with the Merger and the other transactions contemplated by this Agreement prior to the dispatch or making thereof, and the Company shall promptly respond to any reasonable questions from, and reflect any reasonable comments made by, Parent or its counsel with respect thereto prior to the dispatch or making thereof.

-78-

reasonably informed of any material development in such matter and consider in good faith Parent's comments with respect to the defense of such matter.

## ARTICLE VII
## CONDITIONS TO THE MERGER

7.1     *Conditions to Each Party's Obligations to Effect the Merger*. The respective obligations of Parent, Merger Sub and the Company to consummate the Merger are subject to the satisfaction or waiver (where permissible pursuant to applicable Law) prior to the Effective Time of each of the following conditions:

(a) *Requisite Stockholder Approval*. The Company's receipt of the Requisite Stockholder Approval at the Company Stockholder Meeting.

(b) *Competition Approvals*. The waiting periods (and any extensions thereof), if any, applicable to the Merger pursuant to the HSR Act (or under any applicable timing agreements or commitments entered into with or made to the FTC or the DOJ to extend any waiting period or not close the transactions contemplated hereby) and the other Laws set forth in Section 7.1(b) of the Company Disclosure Letter will have expired or otherwise been terminated, or all requisite clearances, consents, and approvals pursuant thereto will have been obtained in each case, without the imposition, individually or in the aggregate, of a Burdensome Condition.

(c) *Other Regulatory Approvals*. The waiting periods (and any extensions thereof), if any, applicable to the Merger pursuant to any of the Laws set forth in Section 7.1(c) of the Company Disclosure Letter will have expired or otherwise been terminated, or all requisite clearances, consents, and approvals pursuant thereto will have been obtained in each case, without the imposition, individually or in the aggregate, of a Burdensome Condition.

(d) *No Prohibitive Laws or Injunctions*. No temporary restraining order, preliminary or permanent injunction or other judgment or order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Merger will be in effect, nor will any action have been taken by any Governmental Authority of competent jurisdiction, and no statute, rule, regulation or order will have been enacted, entered, enforced or deemed applicable to the Merger, that in each case (i) prohibits, makes illegal, or enjoins (or seeks to prohibit, make illegal or enjoin) the consummation of the Merger or (ii) imposes or seeks to impose a Burdensome Condition.

7.2     *Conditions to the Obligations of Parent and Merger Sub*. The obligations of Parent and Merger Sub to consummate the Merger will be subject to the satisfaction or waiver (where permissible pursuant to applicable Law) prior to the Effective Time of each of the following conditions, any of which may be waived exclusively by Parent:

(a) *Representations and Warranties*.

(i)     Other than the representations and warranties listed in Section 7.2(a)(ii), Section 7.2(a)(iii) and Section 7.2(a)(iv), the representations and warranties of the Company set forth

-81-

in this Agreement will be true and correct (without giving effect to any materiality or Company Material Adverse Effect qualifications set forth therein) as of the date of this Agreement and as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct as of such earlier date), except for such failures to be true and correct that would not have or reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(ii)     The representations and warranties set forth in Section 3.1, Section 3.2, Section 3.3, Section 3.4, the second sentence of Section 3.12(a) and Section 3.26 that (A) are not qualified by "material", "materiality" or Company Material Adverse Effect will be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be so true and correct as of such earlier date); and (B) that are qualified by "material," "materiality" or Company Material Adverse Effect will be true and correct (without disregarding such "material," "materiality" or Company Material Adverse Effect qualifications) as of the date of this Agreement and as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be so true and correct as of such earlier date).

(iii)     The representations and warranties set forth in Section 3.8(b) and Section 3.8(c) will be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as if made at and as of the Closing Date.

(iv)     The representations and warranties set forth in Section 3.7(a), the second sentence of Section 3.7(b), the second sentence of Section 3.7(c) and Section 3.7(d)(i)-(v) will be true and correct as of the date of this Agreement and as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct as of such earlier date), except for such inaccuracies that are *de minimis* in the aggregate (viewed in the context of the Company's total capitalization).

(b) *Performance of Obligations of the Company*. The Company will have performed and complied in all material respects with all covenants and obligations of this Agreement required to be performed and complied with by it at or prior to the Closing.

(c) *Officer's Certificate*. Parent and Merger Sub will have received a certificate of the Company, validly executed for and on behalf of the Company and in its name by a duly authorized executive officer thereof, certifying that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied.

(d) *Company Material Adverse Effect*. No Company Material Adverse Effect will have occurred after the date of this Agreement that is continuing.

-82-

7.3     *Conditions to the Company's Obligations to Effect the Merger*. The obligations of the Company to consummate the Merger are subject to the satisfaction or waiver (where permissible pursuant to applicable Law) prior to the Effective Time of each of the following conditions, any of which may be waived exclusively by the Company:

(a)     *Representations and Warranties*. The representations and warranties of Parent and Merger Sub set forth in this Agreement will be true and correct as of the date of this Agreement and as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct as of such earlier date), except for any such failure to be true and correct that would not have or reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(b)     *Performance of Obligations of Parent and Merger Sub*. Parent and Merger Sub will have performed and complied in all material respects with all covenants and obligations of this Agreement required to be performed and complied with by Parent and Merger Sub at or prior to the Closing.

(c)     *Officer's Certificate*. The Company will have received a certificate of Parent and Merger Sub, validly executed for and on behalf of Parent and Merger Sub and in their respective names by a duly authorized officer thereof, certifying that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.

## ARTICLE VIII
## TERMINATION, AMENDMENT AND WAIVER

8.1     *Termination*. This Agreement may be validly terminated at any time prior to the Effective Time, whether prior to or after receipt of the Requisite Stockholder Approval (except as provided herein) only as follows (it being understood and agreed that this Agreement may not be terminated for any other reason or on any other basis):

(a)     by mutual written agreement of Parent and the Company;

(b)     by either Parent or the Company if (i) any permanent injunction or other judgment or order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Merger will be in effect, or any action has been taken by any Governmental Authority of competent jurisdiction, that, in each case, prohibits, makes illegal or enjoins the consummation of the Merger and has become final and non-appealable; or (ii) any statute, rule, regulation or order will have been enacted, entered, enforced or deemed applicable to the Merger that prohibits, makes illegal or enjoins the consummation of the Merger (either of clause (i) or (ii), an "**Injunction**"), except that the right to terminate this Agreement pursuant to this Section 8.1(b) will not be available if the terminating Party's material breach of any provision of this Agreement is the primary cause of the failure of the Merger to be consummated by the Termination Date;

-83-

(c) by either Parent or the Company if the Effective Time has not occurred by 11:59 p.m., Pacific time, on January 18, 2023 (such time and date, the "**Initial Termination Date**", and the Initial Termination Date, as it may be extended pursuant to this Section 8.1(c), the "**Termination Date**"), except that (i) if as of the Initial Termination Date all conditions to this Agreement are satisfied (other than those conditions that by their terms are to be satisfied at the Closing, each of which is capable of being satisfied at the Closing) or waived (where permissible pursuant to applicable Law), other than the conditions set forth in Section 7.1(b), Section 7.1(c) or Section 7.1(d) (solely in connection with an Antitrust Law or Foreign Investment Law), then the Termination Date shall automatically be extended to 11:59 p.m., Pacific time, on April 18, 2023, and (ii) if as of 11:59 p.m., Pacific time, on April 18, 2023, all conditions to this Agreement are satisfied (other than those conditions that by their terms are to be satisfied at the Closing, each of which is capable of being satisfied at the Closing) or waived (where permissible pursuant to applicable Law), other than the conditions set forth in Section 7.1(b), Section 7.1(c) or Section 7.1(d) (solely in connection with an Antitrust Law or Foreign Investment Law), then the Termination Date shall automatically be extended to 11:59 p.m., Pacific time, on July 18, 2023, unless, in the case of each of clauses (i) and (ii), Parent and the Company mutually agree prior to such time in writing that the Termination Date will not be so extended, it being understood that the right to terminate this Agreement pursuant to this Section 8.1(c) will not be available if the terminating Party's material breach of any provision of this Agreement is the primary cause of the failure of the Merger to be consummated by the Termination Date;

(d) by either Parent or the Company if the Company fails to obtain the Requisite Stockholder Approval at the Company Stockholder Meeting (or any adjournment or postponement thereof) at which a vote is taken on the adoption of this Agreement, except that the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to any Party whose material breach of any provision of this Agreement has been the primary cause of the failure to obtain the Requisite Stockholder Approval at the Company Stockholder Meeting (or any adjournment or postponement thereof);

(e) by Parent, if the Company has breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform would (if the Closing were scheduled to occur at such time) result in a failure of a condition set forth in Section 7.2(a) or Section 7.2(b), except that if such breach is capable of being cured by the Termination Date, Parent will not be entitled to terminate this Agreement prior to the delivery by Parent to the Company of written notice of such breach, stating Parent's intention to terminate this Agreement pursuant to this Section 8.1(e) and the basis for such termination, delivered at least 30 days prior to such termination, or, if earlier, the Termination Date, it being understood that Parent will not be entitled to terminate this Agreement (i) if such breach has been cured prior to termination or (ii) if Parent itself is in breach of any provision of this Agreement or has failed to perform or comply with, or if there is any inaccuracy of, any of its representations, warranties, covenants or agreements set forth in this Agreement, and which breach, failure or inaccuracy would result in the failure of the conditions set forth in Section 7.3(a) or Section 7.3(b);

-84-

(f) by Parent, if at any time the Company Board (or a committee thereof) has effected a Company Board Recommendation Change;

(g) by the Company, if Parent or Merger Sub has breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform would (if the Closing were scheduled to occur at such time) result in a failure of a condition set forth in Section 7.3(a) or Section 7.3(b), except that if such breach is capable of being cured by the Termination Date, the Company will not be entitled to terminate this Agreement prior to the delivery by the Company to Parent of written notice of such breach, stating the Company's intention to terminate this Agreement pursuant to this Section 8.1(g) and the basis for such termination, delivered at least 30 days prior to such termination, or, if earlier, the Termination Date, it being understood that the Company will not be entitled to terminate this Agreement (i) if such breach has been cured prior to termination or (ii) if the Company itself is in breach of any provision of this Agreement or has failed to perform or comply with, or if there is any inaccuracy of, any of its representations, warranties, covenants or agreements set forth in this Agreement, and which breach, failure or inaccuracy would result in the failure of the conditions set forth in Section 7.2(a) or Section 7.2(b); or

(h) by the Company, at any time prior to receiving the Requisite Stockholder Approval if (i) the Company has received a Superior Proposal; (ii) the Company Board has authorized the Company to enter into an Alternative Acquisition Agreement to consummate the Acquisition Transaction contemplated by that Superior Proposal and the Company pays or causes to be paid to Parent (or its designee) the Company Termination Fee pursuant to Section 8.3(b)(iii); and (iii) the Company has complied with Section 5.3(d)(ii) with respect to such Superior Proposal.

8.2 *Manner and Notice of Termination; Effect of Termination*.

(a) *Manner of Termination*. The Party terminating this Agreement pursuant to Section 8.1 (other than pursuant to Section 8.1(a)) must deliver prompt written notice thereof to the other Parties setting forth in reasonable detail the provision of Section 8.1 pursuant to which this Agreement is being terminated and the facts and circumstances forming the basis for such termination pursuant to such provision.

(b) *Effect of Termination*. Any proper and valid termination of this Agreement pursuant to Section 8.1 will be effective immediately upon the delivery of written notice by the terminating Party to the other Parties. In the event of the termination of this Agreement pursuant to Section 8.1, this Agreement will be of no further force or effect without liability of any Party (or any partner, member, stockholder, director, officer, employee, affiliate, agent or other representative of such Party) to the other Parties, as applicable, except that Section 3.27, Section 4.10, Section 6.12, the reimbursement obligations of Parent set forth in Section 6.16(c), this Section 8.2, Section 8.3 and Article IX will each survive the termination of this Agreement. Notwithstanding the foregoing, nothing in this Agreement will relieve any Party from any liability for any willful breach of this Agreement. For purposes of this Agreement, "willful breach" means a material breach that is a consequence of an act taken by the breaching party, or the failure by the breaching party to take an act it is required to take under this Agreement, in each case with actual knowledge that the taking of,

or the failure to take, such act would, or would be reasonably expected to, cause a breach of this Agreement. In addition to the foregoing, no termination of this Agreement will affect the rights or obligations of any Party pursuant to the Confidentiality Agreement, which rights, obligations and agreements will survive the termination of this Agreement in accordance with their respective terms.

8.3     *Fees and Expenses*.

(a)  *General*. Except as set forth in this Section 8.3, all fees and expenses incurred in connection with this Agreement and the Merger will be paid by the Party incurring such fees and expenses whether or not the Merger is consummated. For the avoidance of doubt, Parent or the Surviving Corporation will be responsible for all fees and expenses of the Paying Agent.

(b) *Company Termination Fee*.

(i)     *Future Transaction*. If (A) this Agreement is terminated pursuant to (1) Section 8.1(c), and at the time of such termination, either (x) the Company Stockholder Meeting has not yet been held or (y) the condition in Section 7.1(b), Section 7.1(c) or Section 7.1(d) has not been satisfied and the primary cause of the failure of either such condition to be satisfied was a breach of any provision of this Agreement by the Company, (2) Section 8.1(d) or (3) Section 8.1(e); (B) following the execution and delivery of this Agreement and prior to such termination of this Agreement pursuant to Section 8.1(c), Section 8.1(d) or Section 8.1(e) an Acquisition Proposal has been publicly announced (i) on or prior to the date of the Company Stockholder Meeting, with respect to any termination pursuant to Section 8.1(d) or (ii) on or prior to the date of such termination, with respect to any termination pursuant to Section 8.1(c) or Section 8.1(e); and (C) within one year of such termination of this Agreement pursuant to Section 8.1(c), Section 8.1(d) or Section 8.1(e), either an Acquisition Transaction is consummated or the Company enters into a definitive agreement providing for the consummation of an Acquisition Transaction, then the Company will promptly (and in any event within two Business Days) after the earlier of the (1) entry into such definitive agreement or (2) consummation of such Acquisition Transaction pay to Parent (or its designee) an amount equal to $2,270,100,000 (the "**Company Termination Fee**") by wire transfer of immediately available funds to an account or accounts designated in writing by Parent. For purposes of this Section 8.3(b)(i), all references to "15%" in the definition of "Acquisition Transaction" will be deemed to be references to "50%."

(ii)     *Company Board Recommendation Change*. If this Agreement is terminated pursuant to Section 8.1(f), then the Company will promptly (and in any event within two Business Days) following such termination pay to Parent (or its designee) the Company Termination Fee by wire transfer of immediately available funds to an account or accounts designated in writing by Parent.

(iii)     *Superior Proposal*. If this Agreement is terminated pursuant to Section 8.1(h), then the Company will concurrently with such termination pay or cause to be paid to Parent the Company Termination Fee by wire transfer of immediately available funds to an account or accounts designated in writing by Parent.

-86-

(c) *Parent Termination Fee*. If this Agreement is terminated pursuant to (x) Section 8.1(b) due to an Injunction arising from Antitrust Laws or (y) Section 8.1(c) and all conditions to this Agreement are satisfied (other than those conditions that by their terms are to be satisfied at the Closing, each of which is capable of being satisfied at the Closing) or waived (where permissible pursuant to applicable Law), other than the conditions set forth in Section 7.1(b) or Section 7.1(d) (solely in connection with an Antitrust Law), and, in either case of clause (x) or (y), the Company is not then in material breach of any provision of this Agreement (provided that any breach by the Company that is the primary cause of the failure of any condition to this Agreement to be satisfied shall be considered a material breach), then Parent shall promptly pay (or cause to be paid) to the Company (i) if such termination notice is provided prior to January 18, 2023, an amount equal to $2,000,000,000, (ii) if such termination notice is provided after January 18, 2023, and prior to April 18, 2023, an amount equal to $2,500,000,000 or (iii) if such termination notice is provided at any time after April 18, 2023, an amount equal to $3,000,000,000 (any fee payable pursuant to clause (i), (ii) or (iii), the "**Parent Termination Fee**") by wire transfer of immediately available funds to an account or accounts designated in writing by Company.

(d) *Single Payment Only*. The Parties acknowledge and agree that in no event will the Company be required to pay the Company Termination Fee on more than one occasion and in no event will Parent be required to pay the Parent Termination Fee on more than one occasion, whether or not the Company Termination Fee or the Parent Termination Fee may be payable pursuant to more than one provision of this Agreement at the same or at different times and upon the occurrence of different events.

(e) *Payments; Default*. The Parties acknowledge that the agreements contained in this Section 8.3 are an integral part of the Merger, and that, without these agreements, the Parties would not enter into this Agreement. Accordingly, if a Party fails to promptly pay any amount due pursuant to Section 8.3(b) or Section 8.3(c) and, in order to obtain such payment, the other Party commences a Legal Proceeding that results in a judgment against such Party for the amount set forth in Section 8.3(b) or Section 8.3(c) or any portion thereof, the Party that has failed to make such payment will pay to the other Party its out-of-pocket costs and expenses (including attorneys' fees) in connection with such Legal Proceeding, together with interest on such amount or portion thereof at the annual rate of the prime rate as published in *The Wall Street Journal* in effect on the date that such payment or portion thereof was required to be made through the date that such payment or portion thereof was actually received, or a lesser rate that is the maximum permitted by applicable Law.

8.4     *Amendment*. Subject to applicable Law and subject to the other provisions of this Agreement, this Agreement may be amended by the Parties at any time by execution of an instrument in writing signed on behalf of each of Parent, Merger Sub and the Company (pursuant to authorized action by the Company Board (or a committee thereof)), except that in the event that the Company has received the Requisite Stockholder Approval, no amendment may be made to this Agreement that requires the approval of the Company Stockholders pursuant to the DGCL without such approval.

8.5     *Extension; Waiver*. At any time and from time to time prior to the Effective Time, any Party may, to the extent legally allowed and except as otherwise set forth herein, (a) extend the time for the performance of any of the obligations or other acts of the other Parties, as applicable; (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto; and (c) subject to the requirements of applicable Law, waive compliance with any of the agreements or conditions for the benefit of such Party contained herein. Any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed by such Party. Any delay in exercising any right pursuant to this Agreement will not constitute a waiver of such right.

## ARTICLE IX
## GENERAL PROVISIONS

9.1     *Survival of Representations, Warranties and Covenants*. The representations, warranties and covenants of the Company, Parent and Merger Sub contained in this Agreement will terminate at the Effective Time, except for Section 3.27 and Section 4.10 and that any covenants that by their terms survive the Effective Time will survive the Effective Time in accordance with their respective terms.

9.2     *Notices*. All notices and other communications hereunder must be in writing and will be deemed to have been duly delivered and received hereunder (i) four Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid; (ii) one Business Day after being sent for next Business Day delivery, fees prepaid, via a reputable nationwide overnight courier service; (iii) immediately upon delivery by hand; or (iv) at the time sent (if sent before 5:00 p.m., addressee's local time and on the next Business Day if sent after 5:00 p.m., addressee's local time), if sent by email of a .pdf, .tif, .gif, .jpg or similar attachment; provided, that any notice provided by email shall state in such email that it is a notice delivered pursuant to this Section 9.2, in each case to the intended recipient as set forth below:

> (a)     if to Parent or Merger Sub to:
>
> > Microsoft Corporation
> > One Microsoft Way
> > Redmond, Washington 98052-6399
> > Attn:   Amy Hood
> >            Keith R. Dolliver
> > Email: amyhood@microsoft.com
> >            keithd@microsoft.com
>
> > with a copy (which will not constitute notice) to:
>
> > Simpson Thacher & Bartlett LLP
> > 425 Lexington Avenue
> > New York, New York 10017
> > Attn:   Alan M. Klein

-88-

# EXHIBIT D

# FILED UNDER SEAL

# EXHIBIT E

# FILED UNDER SEAL

EXHIBIT F

FILED UNDER SEAL

EXHIBIT G

**Michael E. Haglund,** OSB No. 772030
email: mhaglund@hk-law.com
**Michael K. Kelley,** OSB No. 853782
email: mkelley@hk-law.com
**Shay S. Scott,** OSB No. 934214
email: sscott@hk-law.com
**Sara Ghafouri,** OSB No. 111021
sghafouri@hk-law.com
**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Medford Division)

| | |
|---|---|
| JEFF BOARDMAN, DENNIS RANKIN, ROBERT SEITZ, TODD L. WHALEY, LLOYD D. WHALEY, SOUTH BAY WILD, INC., MISS SARAH, LLC, and MY FISHERIES, INC., | Case No.: 1:15-cv-00108-CL |
| Plaintiffs, | **DECLARATION OF PETER LEIPZIG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| PACIFIC SEAFOOD GROUP, OCEAN GOLD HOLDING CO., INC., DULCICH, INC., FRANK DULCICH, PACIFIC SEAFOOD GROUP ACQUISITION COMPANY, INC., PACIFIC SEAFOOD WASHINGTON ACQUISITION CO., INC., BANDON PACIFIC, INC., BIO-OREGON PROTEIN, INC., PACIFIC CHOICE SEAFOOD COMPANY, PACIFIC COAST SEAFOODS COMPANY, PACIFIC GARIBALDI, INC., PACIFIC GOLD SEAFOOD COMPANY, PACIFIC PRIDE SEA FOOD COMPANY, PACIFIC SEA FOOD CO., PACIFIC SURIMI CO., INC., PACIFIC TUNA | |

PAGE 1 – **DECLARATION OF PETER LEIPZIG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

COMPANY, LLC, WASHINGTON CRAB
PRODUCERS, INC., PACIFIC ALASKA
SHELLFISH, INC., SEA LEVEL
SEAFOODS, LLC, ISLAND FISH CO.,
LLC, PACIFIC RESURRECTION BAY,
PACIFIC CONQUEST, INC.,
CALAMARI, LLC, JO MARIE LLC,
LESLIE LEE, LLC, MISS PACIFIC, LLC,
PACIFIC FUTURE, LLC, PACIFIC
GRUMPY J, LLC, PACIFIC HOOKER,
LLC, PACIFIC HORIZON, LLC,
PACIFIC KNIGHT, LLC, PRIVATEER
LLC, SEA PRINCESS, LLC, TRIPLE
STAR, LLC, PACIFIC FISHING, LLC,
PACIFIC SEA FOOD OF ARIZONA,
INC., STARFISH INVESTMENTS, INC.,
DULCICH SURIMI, LLC, BIO-OREGON
PROPERTIES, LLC, PACIFIC GROUP
TRANSPORT CO., PACIFIC
MARKETING GROUP, INC., PACIFIC
RUSSIA, INC., PACIFIC RUSSIA
VENTURES, LLC, PACIFIC TUNA
HOLDING COMPANY, INC., POWELL
STREET MARKET LLC, PACIFIC
FRESH SEA FOOD COMPANY,
SEACLIFF SEAFOODS, INC., COPPER
RIVER RESOURCE HOLDING CO.,
INC., PACIFIC COPPER RIVER
ACQUISITION CO., INC., SEA LEVEL
SEAFOODS ACQUISITION, INC.,
ISLAND COHO, LLC, S & S SEAFOOD
CO., INC., PACIFIC SEAFOOD DISC,
INC., DULCICH REALTY, LLC,
DULCICH REALTY ACQUISITION,
LLC, and DULCICH JET, LLC,

Defendants.

I, Peter Leipzig, being sworn, say:

1.     I have worked for the Fishermen's Marketing Association since 1978 and have

served as the executive director for the last 34 years.  I make this declaration based upon my own

personal knowledge.

PAGE 2 –  DECLARATION OF PETER LEIPZIG IN
SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

2.      The Fishermen's Market Association (FMA) was founded in 1952 in order to promote stable prices and an orderly flow of seafood products to the consumer.  The FMA membership is composed of trawl vessel owners, skippers and deckhands.  At present, FMA members supply groundfish and shrimp to West Coast seafood processors from Bellingham, Washington to Monterey, California.

3.      Our Association is divided into districts with each district electing members to the FMA board of directors.  Our headquarters and the office where I work is located in McKinleyville, California.

4.      Part of my job as executive director is to closely follow developments within the West Coast fishing industry and to advocate for the interests of the FMA before the U.S. Congress, state legislatures in Washington, Oregon and California and the Pacific Fisheries Management Council.

5.      West Coast fishermen depend upon healthy competition within the processor sector to establish prices for the fish that they sell to earn their livelihood.  During the last 20 years, the FMA's single greatest concern has been the growth of Pacific Seafood Group and its acquisition of so much market power in the groundfish, whiting, shrimp and crab fisheries on the West Coast.  I believe that Pacific Seafood Group has used that power to set prices below those that would prevail in a competitive market and it has disciplined its competition into followings its lead.  As a result, in 2009, for example, West Coast fishermen were being paid prices for shrimp, crab, whiting and groundfish that were no better than or less than those paid 15 years earlier in 1995.  From what I observed during this period, this occurred even though the prices paid by the consumer over the same period were substantially higher and fishermen were

PAGE 3 –  **DECLARATION OF PETER LEIPZIG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Haglund Kelley LLP
200 SW Market Street, Suite 1777
Portland, OR  97201
Tel: (503) 225-0777 / Fax:  (503) 225-1257
0000031209H073PL13

experiencing significantly higher operating costs, especially fuel, which is the single largest cost of operating a fishing vessel.

6.     During my years with the FMA, we have tracked the significant reduction in the number of fish processors over the last 30 years.  At the request of plaintiffs' counsel, I reviewed FMA records and consulted with knowledgeable FMA members and other industry sources to document the number of processors on the West Coast that existed in 1980 (75), 1990 (63), 2000 (26) and 2010 (18).  In the 20 years between 1980 and 2010, our industry suffered a 76% drop in the number of seafood processors on the West Coast.  The details of this data are attached as Exhibit A.

7.     Market conditions along the West Coast continued the same pattern in 2010. Pacific Seafood Group was the first to set its price and the other major processors followed with that price or prices that were very close to those established by Pacific Seafood Group.  As a result, West Coast fishermen struggled financially during the period of 2006-10.  One of the best indicators of this was the state of fishing vessel maintenance up and down the West Coast.  In the more than three decades that I have spent working for the FMA and visiting our Association's members in every port every year, I had never seen the overall state of maintenance at a lower level than what existed throughout 2010.  At the prices that were paid during the years 2005 through 2010, most fishermen were forced to defer maintenance expenses that otherwise would have been a routine part of their yearly operations.

8.     Beginning in 2011, while an antitrust case against Pacific Seafood Group was pending, we started to see some change in the ex vessel markets.  The larger processors who competed with Pacific Seafood Group were more active, and appeared not to be as fearful of Pacific Seafood Group.  A good example was the new pricing for groundfish species as of

PAGE 4 –  **DECLARATION OF PETER LEIPZIG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Haglund Kelley LLP
200 SW Market Street, Suite 1777
Portland, OR  97201
Tel: (503) 225-0777 / Fax:  (503) 225-1257
0000031209H073PL13

January 2011. In 2010, Pacific Seafood Group set the prices for Dover sole at 30 cents per pound and for Petrale sole at 75 cents per pound. For Dover, there was also a 10,000 pound limit on the 30-cent price. Any volume above that limit was priced at only 10 cents per pound. Once Pacific Seafood Group established these prices, they prevailed throughout 2010 and were largely followed by competitor processors. In January of 2011, Bornstein Seafoods was the first to offer groundfish pricing and did so at significantly higher levels: 42 cents per pound for Dover sole without a poundage limit and $1.50 to $2.00 per pound for Petrale sole depending on quality. Unblemished Petrale sole fetched a $2.00 per pound price from Bornstein Seafoods. Pacific Seafood then matched the Dover sole price and began offering $1.50 per pound for Petrale sole.

9.      From my perspective, the changes that we observed in the Dover and Petrale sole ex vessel prices in 2011 were encouraging signs of more healthy competition for groundfish. I believed then those developments were attributable to two major factors: the *Whaley* antitrust case and the rationalization of the groundfish and whiting fisheries through the implementation of an IFQ (individual fish quota) system that became effective on January 1, 2011.

10.      I understand that Pacific Seafood Group negotiated a deal in 2014 to acquire Ocean Gold Seafoods, Inc. and its affiliated companies. If this transaction were to close, it would only enhance the already dominant market power positions of Pacific Seafood Group in the groundfish, whiting and shrimp markets on the West Coast. Our markets would suffer yet another loss of a potential competitor to aggressive consolidation by Pacific Seafood Group. It would be far better for our industry and the competitiveness that is critical to fair ex vessel pricing if Ocean Gold Seafoods were to become completely independent of Pacific Seafood Group either on its own or through a sale to one of Pacific Seafood Group's existing competitors or a new entrant into the market.

PAGE 5 – **DECLARATION OF PETER LEIPZIG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 28th day of January, 2015.

Peter Leipzig

Haglund Kelley LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
Tel: (503) 225-0777 / Fax: (503) 225-1257
0000031209H073PI.13

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of January, 2015, I served the foregoing

**DECLARATION OF PETER LEIPZIG IN SUPPORT OF PLAINTIFFS' MOTION FOR**

**PRELIMINARY INJUNCTION,** the following by the following indicated method(s):

> Michael J. Esler
> John W. Stephens
> Kim T. Buckley
> Esler Stephens & Buckley, LLP
> 121 SW Morrison St., Ste. 700
> Portland, OR 97204-2021
> esler@eslerstephens.com
> stephens@eslerstephens.com
> buckley@eslerstephens.com

☐ by **mailing** a full, true and correct copy thereof in a sealed first-class postage prepaid envelope, addressed to the foregoing attorneys at their last known office address, and deposited with the United States Post Office at Portland, Oregon on the date set forth above.

☐ by **emailing** a full, true and correct copy thereof to the foregoing attorneys at their last known email addresses on the date set forth above.

☐ by causing a full, true and correct copy thereof to be **hand delivered** to the attorneys at their last known address listed above on the date set forth above.

☐ by sending a full, true and correct copy thereof via **overnight mail** in a sealed, prepaid envelope, addressed to the attorneys as shown above on the date set forth above.

☐ by **faxing** a full, true and correct copy thereof to the attorneys at the fax number shown above, which is the last-known fax number for the attorneys' office on the date set forth above.

☒ by transmitting full, true and correct copies thereof to the attorneys through the court's Cm/ECF system on the date set forth above.

/s/Michael E. Haglund

**PAGE 1 -- CERTIFICATE OF SERVICE**

# DECLARATION OF PETER LEIPZIG

# Exhibit A

**WEST COAST SEAFOOD PROCESSORS**
**(1980-2010)**

| Company | 1980 | 1990 | 2000 | 2010 |
|---|---|---|---|---|
| Caito Fisheries | | | | |
|     Caito Fisheries | x | x | x | x |
|     Western California Fish Co. | x | | | |
|     Del Monte Fish Co. | x | | | |
| | | | | |
| California Shellfish Co. | | | | |
|     California Shellfish Co. | x | x | x | x |
|     Point St.George | x | x | | |
|     Alaska Packers | x | | | |
|     The Tides | x | x | | |
|     Hallmark Fisheries | x | x | x | x |
|     Humboldt Seafoods | x | | | |
|     Pt Adams Packing | x | x | x | x |
| | | | | |
| Ocean Beauty | | | | |
|     Ocean Beauty | | | | x |
|     Ocean Foods | x | x | | |
|     Kaskco Seafoods | x | | | |
|     Chinook Packing | x | x | | |
|     South Coast Seafoods | | x | | |
|     Oregon Coast Seafoods | x | | | |
| | | | | |
| Pacific Seafood Group | | | | |
|     Pacific Choice Seafoods | | x | x | x |
|     Pacific Coast Seafoods | | x | x | x |
|     Pacific Shrimp | | | x | x |
|     Bandon Pacific | | | x | x |
|     Washington Crab Producers | | | x | x |
|     Pacific Seafoods | | x | x | x |
| | | | | |
| Peterson Seafoods | | | | |
|     Peterson Seafoods | x | | | |
|     Tap Fisheries | x | | | |
| | | | | |
| Albers Seafood | | | x | x |
| Anchor Seafoods | x | | | |
| Astoria Dock Co. | | x | | |
| Astoria Fish Factors | x | | | |
| Astoria Seafoods | x | x | | |
| Bandon Fisheries | x | x | | |
| Barbey Packing | x | | | |
| Bayside Seafoods | x | | | |
| Bob Morrell Enterprises | | x | | |
| Bornstein Seafoods | x | x | x | x |
| Brandon King Seafoods | | x | | |
| Bumble Bee Seafoods | x | | | |
| Cape Mendocino Fisheries | | x | | |
| Castle Rock Seafood | x | x | | |
| Central Coast Seafoods | | x | | |
| Central Pacific Seafoods | | x | | |

**WEST COAST SEAFOOD PROCESSORS**
**(1980-2010)**

| Company | 1980 | 1990 | 2000 | 2010 |
|---|---|---|---|---|
| Charter Ocean Products | x | | | |
| Chuck's Seafood | x | | | |
| Colontino Rose | x | | | |
| Cordero/Winston & Co. | | x | | |
| Crescent City Fresh Crab | | x | | |
| Crescent Fisheries | x | | | |
| Del Mar Seafoods | | x | x | x |
| Depoe Bay Fisheries | x | x | x | |
| Estero Bay Fish Co. | | x | | |
| Eureka Fisheries | x | x | x | |
| F. Alioto Fish Co. | x | x | x | |
| Fish Hawk Seafoods | | x | x | x |
| Grader Fish Co. | x | | | |
| Harbor Fisheries | x | | | |
| Hoy Brothers | x | x | | |
| Inner Tidal Seafoods | x | | | |
| J. Griffin & Co. | x | | | |
| Jessie's Ilwaco Fish Co. | x | x | x | x |
| Josphson's Smokehouse | x | | | |
| L. Martin & Sons | x | | | |
| Lucas Wharf | x | x | | |
| Marine Reef Fisheries | x | | | |
| Mark I Seafoods | | x | | |
| Mendocino Fisheries | | x | | |
| Meredith Fish Co. | x | x | | |
| Monterey Fish Co. | x | x | x | |
| Morro Bay Seafoods | | x | | |
| Moss Landing Seafoods | | | x | |
| New England Fish Co. | x | | | |
| Newport Seafoods | x | | | |
| Newport Shrimp | x | x | | |
| North Beach Star | x | | | |
| North Coast Fisheries | | x | x | x |
| North End Seafoods | | x | | |
| Noyo Pride Seafoods | x | x | | |
| Ocean Fresh | x | | | |
| Olde Port Fish Co. | x | x | x | |
| Pacific Shrimp of Warrenton | x | | | |
| Pacific Whiting Inc. | x | | | |
| Paladini Fish Co. | x | | | |
| Producers Seafoods | | x | | |
| Raymond Seafoods | | x | | |
| Regal Seafoods | x | x | | |
| San Francisco Fresh Crab | | x | | |
| San Pedro Trawlers Inc. | | x | | |
| Schnaubelt Fisheries | x | | | |
| Sea Pal's | | x | | |
| Sea Products | x | x | | |
| Sea Rock Fisheries | x | | | |
| Seafood Masters | x | | | |

**WEST COAST SEAFOOD PROCESSORS**
**(1980-2010)**

| Company | 1980 | 1990 | 2000 | 2010 |
|---|---|---|---|---|
| Smith's Pacific Seafoods | x | x | x | |
| Spencer and Sons | | x | | |
| Standard Fisheries | x | x | | |
| Tarantino Fish Co. | x | | | |
| Tom Lazio | x | | | |
| United Fisheries | x | | | |
| Washington Crab Producers | x | x | | |
| Westport Fish Co. | | x | | |
| Arrowac Fisheries | x | x | x | |
| Boundary Bay Seafoods | x | x | x | x |
| C K Fish | x | x | x | |
| Dakota Fisheries | x | x | | |
| Kelliher Seafoods | x | x | | |
| Shanks Seafoods | x | | | |
| Shannon Point Seafoods | x | x | | |
| Shell Dahl Seafoods | x | x | | |
| Steward Seafoods | x | | | |
| Zarana Fish (Seafoods) | x | x | | |
| **TOTAL PROCESSORS** | **75** | **63** | **26** | **18** |

## WEST COAST SHRIMP PROCESSORS
### (1980-2010)

| Company | 1980 | 1990 | 2000 | 2010 |
|---|---|---|---|---|
| California Shellfish Co. | | | | |
|     Point St.George | x | x | | |
|     Hallmark Fisheries | x | x | x | x |
|     Pt Adams Packing | x | x | | |
| | | | | |
| Ocean Beauty | | | | |
|     Ocean Foods | x | x | | |
|     South Coast Seafoods | | x | | |
|     Oregon Coast Seafoods | x | | | |
| | | | | |
| Pacific Seafood Group | | | | |
|     Pacific Choice Seafoods | | x | x | x |
|     Pacific Coast Seafoods | | x | x | x |
|     Pacific Shrimp | | | x | x |
|     Bandon Pacific | | | x | x |
|     Washington Crab Producers | | | x | x |
| | | | | |
| Peterson Seafoods | | | | |
|     Peterson Seafoods | x | | | |
|     Tap Fisheries | x | | | |
| | | | | |
| Astoria Seafoods | x | x | | |
| Bandon Fisheries | x | x | | |
| Bornstein Seafoods | x | x | x | x |
| Bumble Bee Seafoods | x | | | |
| Castle Rock Seafood | x | x | | |
| Crescent Fisheries | x | | | |
| Del Mar Seafoods | | x | x | |
| Depoe Bay Fisheries | x | x | x | |
| Eureka Fisheries | x | x | x | |
| Fish Hawk Seafoods | | x | x | |
| Hoy Brothers | x | x | | |
| Jessie's Ilwaco Fish Co. | x | x | x | |
| Meredith Fish Co. | x | x | | |
| New England Fish Co. | x | | | |
| Newport Seafoods | x | | | |
| Newport Shrimp | x | x | | |
| Pacific Shrimp of Warrenton | x | | | |
| Sea Products | x | x | | |
| Smith's Pacific Seafoods | x | x | x | |
| Tom Lazio | x | | | |
| Washington Crab Producers | x | x | | |
| | | | | |
| **TOTAL PROCESSORS** | **26** | **22** | **13** | **7** |

# EXHIBIT H

Joseph M. Alioto (State Bar No 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:          jmalioto@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com
                kmcmahon@saverilawfirm.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNI**A

| | |
|---|---|
| DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PÉREZ,<br><br>          Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>          Defendants. | Case No. 3:22-cv-08991-JSC<br><br>**DECLARATION OF CURTIS BURNS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Curtis Burns, Jr., declare and state as follows:

1.      I am making this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the statements made in this declaration, and if called as a witness, I would completely testify about them.

2.      I am a resident of Oakland, California.

3.      I have been an avid gamer for many years and have played and purchased multiple versions of *Call of Duty* from Activision Blizzard.

4.      Of all Activision Blizzard games, *Call of Duty* is the most important to me. I have played *Call of Duty* games since about when I started playing videogames. I have been playing *Call of Duty* games since *Call of Duty 4* which was released in or about 2007. I estimate that presently most of my time playing video games is spent playing *Call of Duty*, and almost all of that time is playing with friends.

5.      I play games primarily on PlayStation. I am currently subscribed to PlayStation Plus, PlayStation's multi-game library subscription service. I do not currently play on a cloud-based gaming service. While I do not currently use a cloud-based gaming service, I anticipate doing so in the future.

6.      I currently play multiplayer games such as *Call of Duty* with friends. I sometimes play with friends across different gaming platforms. The ability to play with my friends is very important and a big part of why I enjoy playing video games.

7.      *Call of Duty* is one of my favorite videogame franchises. Most of my friends play *Call of Duty*. *Call of Duty* is the video game I play most often, including with my friends.

8.      I prefer to play video games on PlayStation. I have been playing on PlayStations for many years. I prefer the experience of gaming on PlayStation much more than playing games on other platforms.

9.      If Activision Blizzard games were withdrawn from PlayStation, I would be harmed because I could no longer access Activision Blizzard games on my favorite videogame platform. If *Call of Duty* were withdrawn or foreclosed from PlayStation, I would be harmed

2

DECLARATION OF CURTIS BURNS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DocuSign Envelope ID: C7B5D009-AC59-4575-9C7B-6093481F5136

because I could no longer play my favorite game on my favorite video game console. I also would be harmed because I would no longer be able to play my favorite game online with my friends.

10.     If the price of *Call of Duty* were to increase on PlayStation, I would be harmed as I would be paying inflated prices for access to my favorite video game.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct. Executed on April 21, 2023.

By: _____

Curtis Burns, Jr.

---

3

DECLARATION OF CURTIS BURNS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# EXHIBIT I

DocuSign Envelope ID: 372348F2-8739-48EB-BC45-9965D2B1D5E6

1    Joseph M. Alioto (State Bar No 42680)
    Tatiana V. Wallace (SBN 233939)
2    **ALIOTO LAW FIRM**
    One Sansome Street, 35th Floor
3    San Francisco, CA 94104
    Telephone:     (415) 434-8900
4    Facsimile:      (415) 434-9200
    Email:         jmalioto@aliotolaw.com
5

6    Joseph R. Saveri (State Bar No. 130064)
    Steven N. Williams (State Bar No. 175489)
7    Cadio Zirpoli (State Bar No. 179108)
    Elissa Buchanan (State Bar No. 249996)
8    David H. Seidel (State Bar No. 307135)
    Kathleen J. McMahon (State Bar No. 340007)
9    **JOSEPH SAVERI LAW FIRM, LLP**
10   601 California Street, Suite 1000
    San Francisco, California 94108
11   Telephone:     (415) 500-6800
    Facsimile:      (415) 395-9940
12   Email:         jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
13            czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
14           dseidel@saverilawfirm.com
                kmcmahon@saverilawfirm.com
15

16              **UNITED STATES DISTRICT COURT**

17            **NORTHERN DISTRICT OF CALIFORNIA**

18

19   DANTE DEMARTINI, CURTIS BURNS JR.,       Case No. 3:22-cv-08991-JSC
    NICHOLAS ELDEN, JESSIE GALVAN,
20   CHRISTOPHER JOSEPH GIDDINGS-LAFAYE,     **DECLARATION OF DANTE DEMARTINI**
    STEVE HERRERA, HUNTER JOSEPH            **IN SUPPORT OF PLAINTIFFS' MOTION**
21   JAKUPKO, DANIEL DERMOT ALFRED         **FOR PRELIMINARY INJUNCTION**
    LOFTUS, BEOWULF EDWARD OWEN, and
22   IVAN CALVO-PÉREZ,

23               Plaintiffs,

24       v.

25   MICROSOFT CORPORATION, a Washington
    corporation,
26

27              Defendants.

28

DECLARATION OF DANTE DEMARTINI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

DocuSign Envelope ID: 372348F2-8739-48EB-BC15-9895D2B1D5CC

1    I, Dante DeMartini, declare and state as follows:

2        1.    I am making this declaration in support of Plaintiffs' Motion for Preliminary

3    Injunction. I have personal knowledge of the statements, and if called as a witness, I would

4    completely testify about them.

5        2.    I am a resident of San Francisco, California.

6        3.    I play games primarily on PlayStation and PC, but I have also owned an Xbox in

7    the past. When I play on PC, I use the Microsoft Windows operating system. I have subscribed in

8    the past to PlayStation Plus, PlayStation's multi-game library subscription service. While I do

9    not currently use a cloud-based gaming service, I anticipate doing so in the future.

10       4.    I have been an avid gamer for many years and have played and purchased

11   numerous games on different platforms. I have also purchased several games from Activision

12   Blizzard, including *Call of Duty*, *World of Warcraft*, *Starcraft II*, *Overwatch* and *Overwatch 2*,

13   *Diablo III*, and *Hearthstone*.

14       5.    Gaming is very important to my life. Gaming is one of the principal ways I keep

15   in touch and stay connected with my friends.

16       6.    I currently play several multiplayer games, such as those mentioned above and

17   others, with friends. I sometimes play with friends across different gaming platforms. The ability

18   to play with my friends is very important and a big part of why I enjoy playing video games.

19       7.    In the past, one of the biggest factors affecting my decision-making with respect

20   to which gaming platform to purchase is what game titles are available on that platform. What

21   games my friends are playing or anticipate playing also affected my decision-making .

22       8.    The availability of games is still one of the biggest factors that affects my

23   decision-making about which platform to purchase.

24       9.    The availability of games will affect my future decisions about which gaming

25   platforms to purchase.

26       10.   Presently, I primarily use my Windows PC to game. In the past, I used a Mac to

27   play videogames. I stopped using Mac partly because fewer games were available.

28

DECLARATION OF DANTE DEMARTINI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

11.     The availability of Activision Blizzard games in particular is a major factor in deciding which gaming platform to purchase and use. I would consider *Call of Duty* to be the most important game to me because most of my friends play *Call of Duty*. The fact that *Call of Duty* is available on Windows is one of the primary reasons I chose to game on Windows.

12.     If Activision Blizzard games such as *Call of Duty* were made exclusive to Microsoft platforms, it is unlikely that I would purchase or switch to another gaming platform because I do not want to lose access to Activision Blizzard titles such as *Call of Duty*.

13.     In the future, if Activision Blizzard games were exclusive to Microsoft gaming platforms, I would likely purchase Microsoft gaming platforms in order to retain access to Activision Blizzard titles. It is unlikely that I would purchase another gaming platform if it did not have Activision Blizzard titles such as *Call of Duty*.

14.     I play videogames daily, and almost always with my friends. I play Activision Blizzard games frequently, especially *Call of Duty*. Many of my friends that I play games with I do not see regularly. The only way I maintain contact with many of my friends is through videogames and *Call of Duty* specifically.

15.     If the prices of important gaming content such as Activision Blizzard titles were to increase, I would be harmed as I would need to purchase titles at inflated prices.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct. Executed on April 21, 2023.

By:  ___ *Dante DeMartini*

Dante DeMartini

DECLARATION OF DANTE DEMARTINI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT J

1   Joseph M. Alioto (State Bar No 42680)
    Tatiana V. Wallace (SBN 233939)
2   **ALIOTO LAW FIRM**
    One Sansome Street, 35th Floor
3   San Francisco, CA  94104
    Telephone:     (415) 434-8900
4   Facsimile:     (415) 434-9200
    Email:         jmalioto@aliotolaw.com
5
    Joseph R. Saveri (State Bar No. 130064)
6   Steven N. Williams (State Bar No. 175489)
    Cadio Zirpoli (State Bar No. 179108)
7   Elissa Buchanan (State Bar No. 249996)
    David H. Seidel (State Bar No. 307135)
8   Kathleen J. McMahon (State Bar No. 340007)
    **JOSEPH SAVERI LAW FIRM, LLP**
9   601 California Street, Suite 1000
    San Francisco, California 94108
10  Telephone:     (415) 500-6800
    Facsimile:     (415) 395-9940
11  Email:         jsaveri@saverilawfirm.com
                   swilliams@saverilawfirm.com
12                 czirpoli@saverilawfirm.com
                   eabuchanan@saverilawfirm.com
13                 dseidel@saverilawfirm.com
                   kmcmahon@saverilawfirm.com
14

15                 **UNITED STATES DISTRICT COURT**

16                 **NORTHERN DISTRICT OF CALIFORNI**A

17

18  DANTE DEMARTINI, CURTIS BURNS JR.,          Case No. 3:22-cv-08991-JSC
    NICHOLAS ELDEN, JESSIE GALVAN,
19  CHRISTOPHER JOSEPH GIDDINGS-LAFAYE,          **DECLARATION OF JESSIE GALVAN IN**
    STEVE HERRERA, HUNTER JOSEPH                 **SUPPORT OF PLAINTIFFS' MOTION FOR**
20  JAKUPKO, DANIEL DERMOT ALFRED                **PRELIMINARY INJUNCTION**
    LOFTUS, BEOWULF EDWARD OWEN, and
21  IVAN CALVO-PÉREZ,

22                 Plaintiffs,

23        v.

24

25  MICROSOFT CORPORATION, a Washington
    corporation,
26
                   Defendants.
27

28

    ─────────────────────────────────────────────────

          DECLARATION OF JESSIE GALVAN IN SUPPORT OF PLAINTIFFS' MOTION FOR
                              PRELIMINARY INJUNCTION

DocuSign Envelope ID: B7F2A325-63C4-4644-A2F7-88912D832A5F

I, Jessie Galvan, declare and state as follows:

1. I am making this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the statements, and if called as a witness, I would completely testify about them.

2. I am a resident of San Diego, California

3. I have been an avid gamer for many years and have played and purchased numerous games on different platforms. I have also purchased several games from Activision Blizzard, including *Call of Duty*.

4. I primarily play games on PlayStation. I am currently subscribed to PlayStation Plus, PlayStation's multi-game library subscription service. I also use PlayStation's cloud-based gaming service.

5. Gaming is very important to my life. Gaming is one of the principal ways I keep in touch and stay connected with my friends, family, and loved ones. Playing videogames is my primary method of keeping in regular contact with many of my loved ones and is part of my daily routine.

6. I currently play several multiplayer games, such as those mentioned above and others, with friends. I sometimes play with friends across different gaming platforms. The ability to play with my friends is very important and a big part of why I enjoy playing video games. Principally, the game I play most with my friends is *Call of Duty*. Most of my friends play *Call of Duty* so it is important to maintaining our relationships.

7. In the past, one of the biggest factors affecting my decision-making with respect to which gaming platform to purchase is what game titles are available on that platform. What games my friends are playing or anticipate playing also affected my decision-making.

8. The availability of games is still one of the biggest factors that affects my decision-making about which platform to purchase.

9. The availability of games will affect my future decisions about which gaming platforms to purchase.

DECLARATION OF JESSIE GALVAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

10. Oftentimes, videogames are the only way I regularly communicate with some of my friends.

11. The availability of Activision Blizzard games in particular is very important to which gaming platform I buy.

12. I presently subscribe to PlayStation Plus, Sony's multi-game library subscription service. I made the decision to subscribe to PlayStation Plus in part because of the available games.

13. If online multiplayer capability for *Call of Duty* or other Activision Blizzard games were withdrawn from PlayStation such that I would not be able to play Activision Blizzard games with my friends on the PlayStation, I would no longer play Activision Blizzard games on PlayStation

14. I do not currently own an Xbox.

15. If the merger between Microsoft and Activision Blizzard were to occur and Activision Blizzard games were made exclusive to Xbox, I would likely purchase an Xbox in order to access Activision Blizzard games such as *Call of Duty* to continue playing with my friends.

16. If the merger between Microsoft and Activision Blizzard were to occur and Activision Blizzard games were made exclusive to Xbox GamePass, Microsoft's multi-game library subscription service, I would likely subscribe to Xbox GamePass in order to access Activision Blizzard games such as *Call of Duty*.

17. If the merger between Microsoft and Activision Blizzard were to occur and Xbox GamePass was required in order to play Activision Blizzard games online, I would likely subscribe to Xbox GamePass in order to do so.

18. It is unlikely that I would buy a gaming platform in the future that did not have access to Activision Blizzard games such as *Call of Duty*.

19. If the prices of important gaming content such as Activision Blizzard titles were to increase, I would be harmed as I would need to purchase titles at inflated prices. I declare under

DECLARATION OF JESSIE GALVAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DocuSign Envelope ID: B7F2A325-63C4-4644-A2E7-8B912D932A5E

1   penalty of perjury and the laws of the United States that the foregoing is true and correct, and

2   this Declaration is executed on April 21, 2023.

3                                                                    DocuSigned by:

                                                    By: _____ Jessie Galvan
                                                                    7A9B8C3CB0434D5...
4
                                                            Jessie Galvan
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JESSIE GALVAN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

EXHIBIT K

1   Joseph M. Alioto (State Bar No 42680)
    Tatiana V. Wallace (SBN 233939)
2   **ALIOTO LAW FIRM**
    One Sansome Street, 35th Floor
3   San Francisco, CA 94104
    Telephone:    (415) 434-8900
4   Facsimile:    (415) 434-9200
    Email:        jmalioto@aliotolaw.com
5

6   Joseph R. Saveri (State Bar No. 130064)
    Steven N. Williams (State Bar No. 175489)
7   Cadio Zirpoli (State Bar No. 179108)
    Elissa Buchanan (State Bar No. 249996)
8   David H. Seidel (State Bar No. 307135)
    Kathleen J. McMahon (State Bar No. 340007)
9   **JOSEPH SAVERI LAW FIRM, LLP**
    601 California Street, Suite 1000
10  San Francisco, California 94108
    Telephone:    (415) 500-6800
11  Facsimile:    (415) 395-9940
12  Email:        jsaveri@saverilawfirm.com
                  swilliams@saverilawfirm.com
13                czirpoli@saverilawfirm.com
                  eabuchanan@saverilawfirm.com
14                dseidel@saverilawfirm.com
                  kmcmahon@saverilawfirm.com

15
                **UNITED STATES DISTRICT COURT**
16
                **NORTHERN DISTRICT OF CALIFORNIA**
17

18

19  DANTE DEMARTINI, CURTIS BURNS JR.,        Case No. 3:22-cv-08991-JSC
    NICHOLAS ELDEN, JESSIE GALVAN,
20  CHRISTOPHER JOSEPH GIDDINGS-LAFAYE,       **DECLARATION OF HUNTER JAKUPKO**
    STEVE HERRERA, HUNTER JOSEPH             **IN SUPPORT OF PLAINTIFFS' MOTION**
21  JAKUPKO, DANIEL DERMOT ALFRED            **FOR PRELIMINARY INJUNCTION**
    LOFTUS, BEOWULF EDWARD OWEN, and
    IVAN CALVO-PÉREZ,
22
                    Plaintiffs,
23
            v.
24

25  MICROSOFT CORPORATION, a Washington
    corporation,
26
                    Defendants.
27

28

─────────────────────────────────────────────

        DECLARATION OF HUNTER JOSEPH JAKUPKO IN SUPPORT OF PLAINTIFFS'
                    MOTION FOR PRELIMINARY INJUNCTION

I, Hunter Jakupko, declare and state as follows:

1. I am making this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the statements made in this declaration, and if called as a witness, I would completely testify about them.

2. I am a resident of Los Angeles, California.

3. I currently play games predominantly on PlayStation but have previously played on Xbox and PC. I used to play *World of Warcraft* on computer, and when I did, I used the Apple operating system. While I do not currently use a cloud-based gaming service, I anticipate doing so in the future.

4. I have been an avid gamer for many years and have played and purchased numerous games from Activision Blizzard, including *Call of Duty: Modern Warfare 2, Call of Duty: Warzone 2.0, World of Warcraft*, as well as *Overwatch*, and *Overwatch 2*.

5. Gaming is very important to my life. Gaming is one of the principal ways I keep in touch and stay connected with my friends.

6. I currently play several multiplayer games, such as those mentioned above and others with friends. I sometimes play with friends across different gaming platforms. The ability to play with my friends is very important and a big part of why I enjoy playing video games.

7. In the past, one of the biggest factors affecting my decision-making with respect to which gaming platform to purchase is what game titles are available on that platform. What games my friends are playing or anticipate playing also affected my decision-making.

8. The availability of games is still one of the biggest factors that affects my decision-making about which platform to purchase.

9. What games are available will affect my future decisions about which gaming platforms to purchase.

10. Oftentimes, videogames are the only way I regularly communicate with some of my friends.

DECLARATION OF HUNTER JAKUPKO IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DocuSign Envelope ID: B25EB0E0-182C-4B87-BA00-693A39435192

11.     The availability of Activision Blizzard games in particular is very important to which gaming platform I buy.

12.     Of all Activision Blizzard games, *Call of Duty* is the most important to me. Most of my friends play *Call of Duty*. I estimate that presently most of my time playing video games is spent playing *Call of Duty*, and almost all of that time is playing with friends.

13.     I presently subscribe to PlayStation Plus, Sony's multi-game subscription service. I made the decision to subscribe to PlayStation Plus in part because of the games available on it.

14.     I own an Xbox but do not play it currently.

15.     If Activision Blizzard games were made exclusive to Xbox and Windows, I would likely purchase Activision Blizzard titles to play on Xbox and/or Windows, and would likely purchase future Xbox consoles to have access to Activision Blizzard titles, particularly if *Call of Duty* were made exclusive to Xbox.

16.     If online multiplayer capability for Activision Blizzard games were withdrawn from PlayStation such that I would not be able to play Activision Blizzard games with my friends, I would be far less interested in playing Activision Blizzard games on PlayStation.

17.     If Activision Blizzard games such as *Call of Duty* were made only available on Xbox GamePass, Microsoft's multi-game subscription service, I would likely subscribe to Xbox GamePass in order to access Activision Blizzard titles.

18.     In the future, if Activision Blizzard games were exclusive to Microsoft gaming platforms, I would likely purchase Microsoft gaming platforms in order to retain access to Activision Blizzard titles.

19.     If the prices of important gaming content such as Activision Blizzard titles were to increase, I would be harmed as I would need to purchase titles at inflated prices.

DECLARATION OF HUNTER JAKUPKO IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I declare under penalty of perjury and the laws of the United States that the foregoing is
true and correct, and this Declaration is executed on April 21, 2023.

By: _____

Hunter Jakupko

DECLARATION OF HUNTER JAKUPKO IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

EXHIBIT L

Joseph M. Alioto (State Bar No 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:         jmalioto@aliotolaw.com


Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:         jsaveri@saverilawfirm.com
               swilliams@saverilawfirm.com
               czirpoli@saverilawfirm.com
               eabuchanan@saverilawfirm.com
               dseidel@saverilawfirm.com
               kmcmahon@saverilawfirm.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PÉREZ, <br><br> Plaintiffs, <br><br> v. <br><br> MICROSOFT CORPORATION, a Washington corporation, <br><br> Defendants. | Case No. 3:22-cv-08991-JSC <br><br> **DECLARATION OF BEOWULF OWEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

DECLARATION OF BEOWULF OWEN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

I, Beowulf Owen, declare and state as follows:

1.      I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the statements made in this declaration, and if called as a witness, I would completely testify about them.

2.      I am a resident of Las Cruces, New Mexico.

3.      I have played video games for many years. I have played and purchased numerous video games on different platforms. I have also purchased several games from Activision Blizzard, including *Call of Duty*, *Call of Duty: Warzone*, and *Overwatch*.

4.      I presently play games primarily on Xbox and PC. When I play on PC, I primarily use the Microsoft Windows operating system, and occasionally Linux's Ubuntu operating system. I also own a Nintendo Switch and a Steamdeck (a portable gaming device) although I play on those platforms less frequently than on Xbox and PC.

5.      I currently subscribe to Game Pass Ultimate, Microsoft's multi-game library subscription service, which includes games for Xbox and Windows.

6.      I currently play multiplayer games daily, including those mentioned above and others. I rely on videogames to socialize and stay connected with my friends.  The ability to play with my friends is very important and a big part of why I enjoy playing video games.

7.      The availability of games is a major factor that goes into my purchasing decision when considering which gaming platform to purchase. The availability of Activision Blizzard titles such as *Call of Duty* is a major factor when I decide which gaming platform to purchase. I regularly purchase Activision Blizzard titles to play on PC and Xbox.

8.      While I do play video games on PC using both Windows OS and Linux's Ubuntu, I prefer using Linux's Ubuntu rather than Windows. I use Windows to play games, however, because more games are compatible with Windows. Only a handful of games can be played on Linux, but if more games were available on Linux, I would switch to playing on Linux exclusively.

---

1

DECLARATION OF BEOWULF OWEN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

9.     Activision Blizzard games, in particular, comprise a large proportion of my gaming.

10.     Of all Activision Blizzard titles, *Call of Duty* games are particularly important to me. If *Call of Duty* was compatible for Linux, I would switch exclusively to Linux to play *Call of Duty* when gaming on PC. Most of my friends with whom I play games with play *Call of Duty*.

11.     If *Call of Duty* or other Activision Blizzard titles were made exclusive to a platform, I would strongly consider purchasing that platform in order to access *Call of Duty* or Activision Blizzard titles.

12.     If another competing cloud service or game subscription service (other than Microsoft's GamePass) were to emerge with important gaming content such as Activision Blizzard titles, I would likely subscribe to it.

13.     If the prices of important gaming content such as Activision Blizzard titles were to increase, I would be harmed as I would need to purchase titles at inflated prices.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct, and this Declaration is executed in San Francisco, California, on April 21, 2023.



By: _____

Beowulf Owen

DECLARATION OF BEOWULF OWEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# EXHIBIT M

1    Joseph M. Alioto (State Bar No 42680)
     Tatiana V. Wallace (SBN 233939)
2    **ALIOTO LAW FIRM**
     One Sansome Street, 35th Floor
3    San Francisco, CA 94104
     Telephone:    (415) 434-8900
4    Facsimile:    (415) 434-9200
     Email:        jmalioto@aliotolaw.com

5    Joseph R. Saveri (State Bar No. 130064)
6    Steven N. Williams (State Bar No. 175489)
     Cadio Zirpoli (State Bar No. 179108)
7    Elissa Buchanan (State Bar No. 249996)
     David H. Seidel (State Bar No. 307135)
8    Kathleen J. McMahon (State Bar No. 340007)
     **JOSEPH SAVERI LAW FIRM, LLP**
9    601 California Street, Suite 1000
     San Francisco, California 94108
10   Telephone:    (415) 500-6800
11   Facsimile:    (415) 395-9940
     Email:        jsaveri@saverilawfirm.com
12                 swilliams@saverilawfirm.com
                   czirpoli@saverilawfirm.com
13                 eabuchanan@saverilawfirm.com
                   dseidel@saverilawfirm.com
14                 kmcmahon@saverilawfirm.com

15                   **UNITED STATES DISTRICT COURT**

16                   **NORTHERN DISTRICT OF CALIFORNI**A

17

18   DANTE DEMARTINI, CURTIS BURNS JR.,      Case No. 3:22-cv-08991-JSC
     NICHOLAS ELDEN, JESSIE GALVAN,
19   CHRISTOPHER JOSEPH GIDDINGS-LAFAYE,     **DECLARATION OF DANIEL LOFTUS IN**
     STEVE HERRERA, HUNTER JOSEPH           **SUPPORT OF PLAINTIFFS' MOTION FOR**
20   JAKUPKO, DANIEL LOFTUS, BEOWULF        **PRELIMINARY INJUNCTION**
     EDWARD OWEN, and IVAN CALVO-PÉREZ,
21
                        Plaintiffs,
22
23           v.

24   MICROSOFT CORPORATION, a Washington
     corporation,
25
                        Defendants.
26

27

28   Case No. 3:22-cv-08991-JSC                    1
     DECLARATION OF DANIEL LOFTUS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
                                        INJUNCTION

1     I, Daniel Loftus, declare and state as follows:

2     1.     I am making this declaration in support of Plaintiffs' Motion for Preliminary

3 Injunction. I have personal knowledge of the statements made in this declaration, and if called as

4 a witness, I would completely testify about them.

5     2.     I am a resident of San Francisco, California.

6     3.     I have been an avid gamer for many years and have played and purchased games

7 from Activision Blizzard, including multiple versions of *Call of Duty*, and *Overwatch*.

8     4.     I play games primarily on PlayStation. I am currently subscribed to PlayStation

9 Plus, PlayStation's multi-game library subscription service. While I do not currently use a cloud-

10 based gaming service, I anticipate doing so in the future.

11     5.     I currently play multiplayer games, such as those mentioned above and others

12 with friends. I sometimes play with friends across different gaming platforms. The ability to play

13 with my friends is very important and a big part of why I enjoy playing video games. Principally,

14 the game I play most with my friends is *Call of Duty*. Most of my friends play *Call of Duty* so it

15 is important to maintain our relationships.

16     6.     In the past, one of the biggest factors affecting my decision-making with respect

17 to which gaming platform to purchase is what game titles are available on that platform. What

18 games my friends are playing or anticipate playing also affected my decision-making.

19     7.     The availability of games is still one of the biggest factors that affects my

20 decision-making about which platform to purchase.

21     8.     What games are available will affect my future decisions about which gaming

22 platforms to purchase.

23     9.     Oftentimes, videogames are the only way I regularly communicate with some of

24 my friends and family.

25     10.     The availability of Activision Blizzard games in particular is very important to

26 which gaming platforms I buy.

27

28   Case No. 3:22-cv-08991-JSC          2

11. Of all Activision Blizzard games, *Call of Duty* is the most important to me. I have played *Call of Duty* games since about when I started playing videogames. Most of my friends play *Call of Duty*. I estimate that presently most of my time playing video games is spent playing *Call of Duty*, and almost all of that time is playing with friends.

12. I presently subscribe to PlayStation Plus, Sony's multi-game subscription service. I made the decision to subscribe to PlayStation Plus in part because of the games available on it.

13. If online multiplayer capability for *Call of Duty* or other Activision Blizzard games were withdrawn from PlayStation such that I would not be able to play Activision Blizzard games with my friends on the PlayStation, I would no longer play Activision Blizzard games on PlayStation.

14. I do not currently own an Xbox Series X|S.

15. If the merger between Microsoft and Activision Blizzard were to occur and Activision Blizzard games were made exclusive to Xbox, I would likely purchase an Xbox in order to access Activision Blizzard games such as *Call of Duty*.

16. If Activision Blizzard games were made accessible only on Xbox GamePass, Microsoft's multi-game library subscription service, once I had purchased an Xbox, I would likely subscribe to GamePass in order to access Activision Blizzard games such as *Call of Duty*.

17. If the prices of important gaming content such as Activision Blizzard titles were to increase, I would be harmed as I would need to purchase titles at inflated prices.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct. Executed in on April 21, 2023.

By: _Daniel Loftus_

Daniel Loftus

EXHIBIT N

1   Valarie C. Williams (Bar No. 335347)
2   Tania Rice (Bar No. 294387)
    Alston & Bird LLP
3   560 Mission Street, Suite 2100
    San Francisco, CA 94105
4   Telephone: (415) 243-1000
    valarie.williams@alston.com
5   tania.rice@alston.com

6   B. Parker Miller (*pro hac vice*)
    Alston & Bird LLP
7   1201 West Peachtree Street, Suite 4900
    Atlanta, GA 30309
8   Telephone: (404) 881-7000
    parker.miller@alston.com
9
10  Beth Wilkinson (*pro hac vice*)
    Rakesh N. Kilaru (*pro hac vice*)
11  Kieran Gostin (*pro hac vice*)
    Anastasia M. Pastan (*pro hac vice*)
12  Jenna Pavelec (*pro hac vice*)
    Wilkinson Stekloff LLP
13  2001 M Street NW, 10th Floor
    Washington, DC 20036
14  Telephone: (202) 847-4000
    bwilkinson@wilkinsonstekloff.com
15  rkilaru@wilkinsonstekloff.com
    kgostin@wilkinsonstekloff.com
16  apastan@wilkinsonstekloff.com
    jpavelec@wilkinsonstekloff.com
17
18  *Counsel for Defendant Microsoft Corporation*
19
20              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
21

22  DANTE DEMARTINI, *et al.*,                Case No. 3:22-cv-08991-JSC

23                  Plaintiffs,               **DECLARATION OF CYNTHIA**
                                              **RANDALL IN SUPPORT OF**
24  v.                                        **DEFENDANT MICROSOFT**
                                              **CORPORATION'S ADMINISTRATIVE**
25  MICROSOFT CORPORATION,                    **MOTION TO FILE UNDER SEAL**

26                  Defendant.                Hon. Jacqueline Scott Corley
27
28

                                              DECL. OF CYNTHIA RANDALL
                                              Case No. 3:22-cv-08991-JSC

I, Cynthia Randall, declare as follows:

1.      I am Associate General Counsel at Microsoft Corporation.  I have knowledge of the matters set forth in this declaration, and I could and would competently testify thereto if called to do so.

2.      I make this declaration in support of Microsoft's Administrative Motion to File Under Seal, which relates to materials attached to Microsoft's Opposition to Plaintiffs' Motion for a Preliminary Injunction.  From the course of my duties and responsibilities, I have knowledge of Microsoft's business practices and its treatment of certain types of documents and information as confidential—including the types of documents and information that are at issue in the Administrative Motion to File Under Seal and discussed in greater detail below.

3.      The materials labeled as Confidential Contracts (Opp. at 15:9-15 & n.12; Kilaru Decl., Exs. C, D, E; Stuart Decl. ¶¶ 15, 16; Stuart Decl., Ex. C) are agreements that contain confidential terms, and testimony discussing those agreements, negotiations, and related business strategy.  Each agreement contains a confidentiality provision that prohibits Microsoft from disclosing its terms.  Additionally, Exhibit C to the Stuart Declaration contains sensitive and confidential disclosures and business information.  It would cause competitive harm to Microsoft and third parties if these documents were publicly disclosed.  For example, Microsoft negotiates agreements with other video game developers, and it could harm Microsoft's negotiating position if those developers could compare the terms of these agreements (or offered agreement).  The terms of the agreements and related testimony also divulge Microsoft's strategy in the market, which could be copied or used by its competitors to obtain a competitive advantage.  Microsoft takes reasonable steps to maintain the confidentiality of these documents.  It produced them to the FTC and in this action as Highly Confidential.

4.      The materials labeled Business Strategy (Opp. at 15:3, 15:19, 15:20, 16:17-18; Stuart Decl. ¶¶ 8, 17-21; Stuart Decl., Ex. B) contain and discuss internal, confidential business strategies and analyses.  They relate to an internal strategy presentation to Microsoft's board of directors, used in Microsoft's decision-making.  It contains detailed internal analysis of, for example, the expected value of the merger, communications strategies, and diligence findings.  It would cause competitive

1

harm to Microsoft if these documents were publicly disclosed. For example, competitors could capitalize on this insight to exploit Microsoft's internal strategies. Microsoft takes reasonable steps to maintain the confidentiality of this information and does not disseminate it beyond limited internal employees. It produced the underlying documents to the FTC and in this action as Highly Confidential.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on May 5, 2023.

Cynthia Randall

DECL. OF CYNTHIA RANDALL
Case No. 3:22-cv-08991-JSC

EXHIBIT O

FORBES > INNOVATION > GAMES

# 'Call Of Duty' 2023 Release Date And Beta Dates Leak Online

**Erik Kain** Senior Contributor ⓘ

*I write about video games, entertainment and culture.*

Follow

💬 0

Feb 13, 2023, 07:00am EST

Listen to article   3 minutes



The next Call Of Duty could be Modern Warfare 3.   CREDIT: ACTIVISION

Following rumors that 2023 would not see the release of a new *Call Of Duty,* with a two-year cycle planned for *Modern Warfare II,* it appears that Activision has changed course. According to a report from Tom Henderson at Insider Gaming, this year will see the launch of a full-price, premium Call Of Duty entry, after all.

Both Henderson and Bloomberg's Jason Schreier have confirmed
that the lead studio on this next project, which may be *Modern
Warfare III,* is Sledgehammer Games, though as with all games in
the franchise, each is the product of multiple studios collaborating
on development.

This is somewhat disappointing, as a two-year cycle would have
allowed *Modern Warfare II* to really come into its own, with many
more maps and modes than the typical CoD entry.
Microtransactions would also last longer, rather than having to buy
all-new cosmetics with the release of a new game. Likewise, having
just one premium CoD alongside the free-to-play *Warzone 2.0*
allows for a more streamlined experience.

Henderson may not know the title of the 2023 game, but he has the
dates. The next Call Of Duty is reportedly set to launch on PS4/PS5,
Xbox One/Xbox Series X|S and PC on November 10th, 2023. Other
key dates for the PlayStation-only beta, the full beta and the
Campaign Early Access period are:

- Beta weekend 1 (PS4/PS5) – October 6, 2023 – October 10,
  2023

- Beta weekend 2 (PS4/PS5/Xbox One/Xbox Series X|S/PC) –
  October 12, 2023 – October 16, 2023

- Campaign Early Access ((PS4/PS5/Xbox One/Xbox Series
  X|S/PC) – November 2, 2023

---

MORE FROM FORBES ADVISOR

**Best Travel Insurance Companies**

By **Amy Danise** Editor

**Best Covid-19 Travel Insurance Plans**

By **Amy Danise** Editor

This certainly sounds like it could be legit. *Modern Warfare II* followed this identical pattern, with a PlayStation-first beta, a pre-order/open beta, early access for pre-order customers and then the full release. This appears to be the new launch model for the shooter franchise.

**Forbes Daily: Get our best stories, exclusive reporting and essential analysis of the day's news in your inbox every weekday.**

| Email address | Sign Up |
|---|---|

By signing up, you accept and agree to our Terms of Service (including the class action waiver and arbitration provisions), and Privacy Statement.

Henderson's reporting on *Call Of Duty* rumors and leaks has been very accurate in the past, so this is solid intel, but as always with this sort of thing take it with a grain of salt. Plans change, obviously, as it sounds like this is a pivot on Activision's part. The publisher reportedly did plan on releasing 'premium DLC' for *Modern Warfare II* in 2023 but has moved to a full release instead.

It could be that the new game was simply too much content for an expansion, or the notion of missing a full release—which Activision has never done in over a decade of Call Of Duty—was too risky, and could potentially spook investors during a very uncertain time for the publisher, as Microsoft continues to battle regulators (and Sony) over its bid to acquire the company.

**Update:** Activision mentions the 2023 premium release in its latest earnings call as well.

## Hogwarts Legacy Playthrough Part 1: Intro Gameplay



As always, I'd love it if you'd follow me here on this blog and subscribe to my YouTube channel and my Substack so you can stay up-to-date on all my TV, movie and video game reviews and coverage. Thank

*Follow me on Twitter. Check out my website.*

 **Erik Kain**

[ Follow ]

I write about TV shows like House Of The Dragon, The Witcher, The Rings Of Power, Stranger Things, Yellowjackets, Severance and many others. I also cover movies, video... **Read More**

Editorial Standards                              Reprints & Permissions

ADVERTISEMENT

EXHIBIT P

1  Caroline Van Ness (SBN 281675)
   SKADDEN, ARPS, SLATE, MEAGHER &
2  FLOM LLP
   525 University Avenue
3  Palo Alto, California 94301
   Telephone: (650) 470-4500
4  Facsimile: (650) 470-4570
   Email: caroline.vanness@skadden.com
5
   Steven C. Sunshine (*pro hac vice*)
6  Julia K. York (*pro hac vice*)
   SKADDEN, ARPS, SLATE, MEAGHER &
7  FLOM LLP
   1440 New York Avenue, N.W.
8  Washington, DC 20005-2111
   Telephone: (202) 371-7000
9  Facsimile: (202) 393-5760
   Email: steven.sunshine@skadden.com
10 Email: julia.york@skadden.com

11  *Attorneys for Non-Party Activision Blizzard, Inc.*

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14

15  DANTE DEMARTINI, et al.,            Case No. 3:22-cv-08991-JSC

16              Plaintiffs,             **NON-PARTY ACTIVISION BLIZZARD,
                                        INC.'S STATEMENT IN RESPONSE TO
16          v.                          DEFENDANT MICROSOFT
                                        CORPORATION'S ADMINISTRATIVE
17                                      MOTION TO CONSIDER WHETHER
    MICROSOFT CORPORATION, a            ANOTHER PARTY'S MATERIAL
18  Washington corporation,             SHOULD BE SEALED [ECF NO. 162]

19              Defendant.

20                                      Judge: Hon. Jacqueline Scott Corley

21

22

23

24

25

26

27

28

## I.  **INTRODUCTION**

Pursuant to Civil Local Rules 7-11 and 79-5(f), Non-Party Activision Blizzard, Inc. ("Activision") respectfully seeks to keep under seal a short excerpt of Defendant Microsoft Corp.'s ("Microsoft") Opposition to Plaintiffs' Motion for a Preliminary Injunction (ECF No. 163), along with certain portions of three exhibits filed in support thereof (ECF Nos. 163-3, 163-7, and 163-8). These documents contain non-public, highly sensitive, and confidential information that could affect Activision's competitive standing, as further described below and in the Declaration of Page Robinson ("Robinson Decl.").[1]  Activision designated these documents as "Highly Confidential – Outside Counsel Only" under the governing Protective Order (ECF No. 71), and the Stipulation regarding the Protective Order Activision entered into with Plaintiffs and Microsoft (ECF No. 101).[2]

| Document | Portions to be Filed Under Seal | Party Claiming Confidentiality |
|---|---|---|
| Microsoft's Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opposition" or "Opp.") | Page 8, lines 25–26 | Activision |
| Declaration of Rakesh Kilaru ("Kilaru Decl.") ISO Opp., Ex. B. | Page 187, line 1 through page 190, line 25 | Activision |
| Kilaru Decl. ISO Opp., Ex. F | Page 49, line 1 through page 53, line 25; Page 64, line 1 through page 65, line 25; and Page 77, line 1 through page 78, line 23 | Activision |
| Kilaru Decl. ISO Opp., Ex. G | Page 112, line 2 through page 113, line 24 | Activision |

## II.  **LEGAL STANDARD**

"[A]ccess to judicial records is not absolute."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).  Where the motion at issue is "more than tangentially related to the

---

[1] To the extent any party submits, or is requested to submit, chambers copies of the documents at issue here, Activision respectfully requests to make arrangements to pick up the documents upon disposition of Microsoft's Administrative Motion pursuant to Section E of the Court's Civil Standing Order.

[2] Activision sought the parties' positions on the instant motion before Noon Pacific Time on May 11, 2023.  Microsoft informed Activision that it does not intend to oppose Activision's request to keep these materials under seal; as of 5:00 pm Pacific Time on May 12, Plaintiffs had not provided their position.

1  merits of a case," courts apply the "compelling reasons" standard; otherwise, courts apply "the less

2  exacting good cause standard." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–

3  97, 1101–02 (9th Cir. 2016) (internal quotation marks and citation omitted).

4      Courts find "compelling reasons" to seal documents, such as the "terms of confidential

5  contracts" or "contract negotiations," *Fed. Trade Comm'n v. Qualcomm Inc.*, 2019 WL 95922, at *3

6  (N.D. Cal. Jan. 3, 2019), where they could be used "as sources of business information that might

7  harm a litigant's competitive standing." *Ctr. for Auto Safety*, 809 F.3d at 1097 (internal quotation

8  marks and citation omitted). Courts have similarly found "compelling reasons" in favor of sealing

9  confidential information produced by third parties where it consists of "competitive information that

10  could cause damage to the third parties if made public." *United States v. Bazaarvoice, Inc.*, 2014

11  WL 11297188, at *1 (N.D. Cal. Jan. 21, 2014) (granting motions to seal and observing both that "the

12  third parties did not voluntarily put [the information] at issue" and that "[i]f the Court required the

13  information to be disclosed, it would chill investigations in the future where third-party documents

14  are essential").

15  **III.  ACTIVISION'S CONFIDENTIAL INFORMATION SHOULD BE SEALED**

16      Activision's non-public, highly sensitive, and confidential information should be sealed,

17  whether analyzed under the "compelling reasons" or less exacting "good cause" standards, because

18  its release would irreparably damage Activision.

19      The information generally falls into three categories:

20  •  The terms of, and negotiations regarding, commercial agreements, which contain

21      confidentiality provisions that require Activision to keep their terms confidential.

22      Additionally, some of the agreements contain non-public terms of exclusivity. (Robinson

23      Decl. ¶ 4.)

24  •  The terms, and existence of, a commercial agreement proposed by Activision, but not

25      executed. (*Id.* at ¶ 6.)

26  •  Activision's decision to participate, or not, in newly-developed services, and its rationale

27      for doing so or not doing so. (*Id.* at ¶ 8.)

28  Public disclosure of the above-described information would significantly harm Activision.

Activision does not disclose this information publicly or to third parties, and the information is not even shared internally beyond a very limited number of Activision employees. (*Id.* at ¶¶ 4, 10.) If such information were made publicly available, Activision's competitors and other industry actors would take advantage of Activision in negotiations, wasting the time and resources Activision has expended to develop its competitive strategies. (*Id.* at ¶¶ 5, 7.) For example, video game developers and platform providers would take advantage of Activision in negotiating commercial agreements if those developers and providers could compare their proposed commercial terms to confidential commercial terms to which Activision has previously agreed. (*Id.* at ¶ 5.) Disclosure of this confidential information would also cause Activision competitive harm because it would give competing video game developers insight into Activision's assessment of potential opportunities, permitting them to leverage Activision's internal decision-making and insights to alter their strategic plans or offerings. (*Id.* at ¶¶ 5, 7, 9.)

The information Activision seeks to seal is narrowly tailored. The redactions are limited to information regarding: (1) the terms of, and negotiations regarding, commercial agreements; (2) the terms, and existence of, a proposed commercial agreement; and (3) Activision's decision to participate, or not to participate, in newly-developed services—each of which must be withheld to prevent competitive harm to Activision.

## IV.   **CONCLUSION**

For the foregoing reasons, and as further set forth in the Robinson Decl., the Court should seal the identified portions of the Opposition and exhibits filed in support thereof.

DATED: May 12, 2023

By: /s/ *Caroline Van Ness*

Caroline Van Ness (SBN 281675)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
Email: caroline.vanness@skadden.com

Steven C. Sunshine (*pro hac vice*)
Julia K. York (*pro hac vice*)

Case 3:22-cv-08991-JSC Document 183, Filed 05/12/23 Page 25 of 40

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: steven.sunshine@skadden.com
Email: julia.york@skadden.com

*Attorneys for Non-Party Activision Blizzard, Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-4-

ACTIVISION BLIZZARD, INC.'S STATEMENT RE: DEFENDANT'S ADMIN. MOTION        CASE NO. 3:22-cv-08991-JSC

1  Caroline Van Ness (SBN 281675)
   SKADDEN, ARPS, SLATE,
2  MEAGHER & FLOM LLP
   525 University Avenue
3  Palo Alto, California 94301
   Telephone: (650) 470-4500
4  Facsimile: (650) 470-4570
   Email: caroline.vanness@skadden.com
5
   Steven C. Sunshine (*pro hac vice*)
6  Julia K. York (*pro hac vice*)
   SKADDEN, ARPS, SLATE,
7  MEAGHER & FLOM LLP
   1440 New York Avenue, N.W.
8  Washington, DC 20005-2111
   Telephone: (202) 371-7000
9  Facsimile: (202) 393-5760
   Email: steven.sunshine@skadden.com
10 Email: julia.york@skadden.com

11 *Attorneys for Non-Party Activision
   Blizzard, Inc.*
12

13                **UNITED STATES DISTRICT COURT**

14               **NORTHERN DISTRICT OF CALIFORNIA**

15 | DANTE DEMARTINI, et al.,                | Case No. 3:22-cv-08991-JSC

16 |         Plaintiffs,                     | **DECLARATION OF PAGE ROBINSON IN
                                             | SUPPORT OF NON-PARTY ACTIVISION
17 |    v.                                   | BLIZZARD, INC.'S STATEMENT IN
                                             | RESPONSE TO DEFENDANT
18 | MICROSOFT CORPORATION, a                | MICROSOFT CORPORATION'S
     Washington corporation,                | ADMINISTRATIVE MOTION TO
19 |                                         | CONSIDER WHETHER ANOTHER
   |         Defendant.                      | PARTY'S MATERIAL SHOULD BE
20 |                                         | SEALED [ECF NO. 162]

21

22                                            Judge: Hon. Jacqueline Scott Corley

23

24

25

26

27

28

I, Page Robinson, declare as follows:

1.     I am a Senior Director of Litigation and Intellectual Property at Activision Blizzard, Inc. ("Activision").  I submit this declaration in support of Activision's Statement in Response to Defendant Microsoft Corporation's Administrative Motion to Consider Whether Another Party's Material Should be Sealed.   In my role, I have personal knowledge of Activision's use and protection of non-public, highly sensitive, and confidential business information, including the information at issue here.

2.     I have personal knowledge of the facts set forth below, and I can and would competently testify to such facts if called to do so.

3.     I have reviewed and am familiar with the portions of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (the "Opposition" or "Opp."), along with the three exhibits filed in support thereof, that Defendant filed under seal because they contained information designated by Activision as "Highly Confidential" or "Outside Counsel Only."   Such portions are identified in Defendant's Administrative Motion to Consider Whether Another Party's Material Should be Sealed (ECF No. 162).

4.     Specifically, some of the portions contain information reflecting the terms of, and negotiations regarding, commercial agreements that Activision does not disclose to third parties.   In fact, the agreements contain confidentiality provisions that require Activision to keep these terms confidential.  Additionally, some of the agreements contain non-public terms of exclusivity.

5.     It would cause competitive harm to Activision if the above information was publicly disclosed.  For example, when Activision negotiates commercial agreements with other video game developers or platform providers, it would harm Activision's negotiating position if those developers and providers could compare the previous terms of, and negotiations regarding, similar commercial agreements to which Activision has previously agreed.  Moreover, disclosure of such terms and negotiations would harm Activision by allowing other video game developers to circumvent the time and resources expended by

2

Activision in developing the practices and strategies which culminated in those terms and negotiations.

6.      Some of the portions also contain information discussing the terms, and existence of, a commercial agreement that was proposed by Activision, but not executed.

7.      It would cause competitive harm to Activision if the above information was publicly disclosed.  For example, disclosure would give competing video game developers insight into Activision's assessment of potential opportunities and they may alter their strategic plans or offerings if they knew the subject matter of the proposed commercial agreement.  Disclosure would also harm Activision's negotiating position with platform providers.

8.      Other portions further contain information regarding Activision's decision to participate, or not to participate, in newly-developed distribution services, as well as Activision's rationale for choosing to do so or not to do so.

9.      It would cause competitive harm to Activision if the above information was publicly disclosed.  For example, other video game developers or platform providers may use Activision's decision-making against it in deciding whether or not to seek out such opportunities for themselves.

10.      Activision takes robust measures to maintain the confidentiality of all the above-described information; it is not shared beyond a very limited number of Activision employees, who only have access to the information on a need-to-know basis.  All of this information was designated "Highly Confidential – Outside Counsel Only" under the governing Protective Order in this action.

11.      For these reasons, Activision respectfully requests that the Court order the below-identified portions of the Opposition and concurrently filed exhibits to be sealed.

| Document | Text to be Sealed | Basis for Sealing Portion of Document |
|---|---|---|
| Opp. | Page 8, lines 25–26 | This text contains confidential and proprietary information that Activision does not share publicly with respect to non-public terms of exclusivity |

3

| Document | Text to be Sealed | Basis for Sealing Portion of Document |
|---|---|---|
| | | contained in a commercial agreement. If such information were publicly disclosed, Activision would suffer economic harm because other video game developers and platforms would be able to gain an unfair advantage. |
| Declaration of Rakesh Kilaru ("Kilaru Decl.") ISO Opp., Ex. B. | Page 187, line 1 through page 190, line 25 | This text contains confidential and proprietary information that Activision does not share publicly with respect to a commercial agreement that was proposed but not executed. If such information were publicly disclosed, Activision would suffer economic harm as other video game developers and platforms would be able to gain an unfair advantage. |
| Kilaru Decl. ISO Opp., Ex. F | Page 49, line 1 through page 53, line 25; Page 64, line 1 through page 65, line 25; and Page 77, line 1 through page 78, line 23 | This text contains confidential and proprietary information that Activision does not share publicly with respect to commercial agreements that contain confidentiality provisions, as well as Activision's decision to participate, or not to participate, in newly-developed services. If such information were publicly disclosed, Activision would suffer economic harm as other video game developers and platforms would be able to gain an unfair advantage. |
| Kilaru Decl. ISO Opp., Ex. G | Page 112, line 2 through page 113, line 24 | This text contains confidential and proprietary information that Activision does not share publicly with respect to commercial agreements that contain confidentiality provisions, as well as non-public terms of exclusivity contained in one such agreement. If such information were publicly disclosed, Activision would suffer economic harm because other video game developers and platforms would be able to gain an unfair advantage. |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

4

Executed on May 12, 2023, in Santa Monica, California.

Page Robinson

## SIGNATURE ATTESTATION

Pursuant to Civil Local Rule 5-1(h)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from any other signatory to this document.

Dated: May 12, 2023                                   */s/ Caroline Van Ness*
                                                      Caroline Van Ness

Case: 23-15846, 06/20/2023, ID: 12739624, DktEntry: 18, Page 137 of 140

.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANTE DEMARTINI, et al., | Case No. 3:22-cv-08991-JSC |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING DEFENDANT MICROSOFT CORPORATION'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER ANOTHER PARTY'S MATERIAL SHOULD BE SEALED [ECF NO. 162]** |
| v. | |
| MICROSOFT CORPORATION, a Washington corporation, | |
| Defendant. | Judge: Hon. Jacqueline Scott Corley |

This matter came before the Court on Defendant Microsoft Corp.'s ("Microsoft") Administrative Motion to Consider Whether Another Party's Material Should be Sealed (ECF No. 162). Having considered Microsoft's Motion and the Declaration of Valarie C. Williams, the Court hereby orders that the Motion is **GRANTED** as follows:

| Document | Portions to be Filed Under Seal | Ruling |
|---|---|---|
| Microsoft's Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") | Page 8, lines 25–26 | |
| Declaration of Rakesh Kilaru ("Kilaru Decl.") ISO Opp., Ex. B . | Page 187, line 1 through page 190, line 25 | |
| Kilaru Decl. ISO Opp., Ex. F | Page 49, line 1 through page 53, line 25; Page 64, line 1 through page 65, line 25; and Page 77, line 1 through page 78, line 23 | |
| Kilaru Decl. ISO Opp., Ex. G | Page 112, line 2 through page 113, line 24 | |

IT IS SO ORDERED.

DATED: _____, 2023        _____
                                                   Honorable Jacqueline Scott Corley
                                                   United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  */s/ Valarie C. Williams*